STATE of Tennessee, Appellee,

v.

Milburn L. EDWARDS, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

March 25, 1993.

Permission to Appeal Denied by Supreme Court Aug. 2, 1993.

Jeffrey A. DeVasher, Sr. Asst. Public Defender, Nashville (on appeal), Karl F. Dean, Metro Public Defender, and Laura C. Dykes, Sr. Asst. Public Defender, Nashville (at trial), for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Kathy M. Principe, Asst. Atty. Gen., Christina S. Shevalier, Legal Asst., Tom Thurman, and Katrin Novak–Miller, Asst. Dist. Attys. Gen., Nashville, for State.

*OPINION*

WADE, Judge.

The defendant, Milburn L. Edwards, was convicted of 21 counts of rape, two counts of first degree burglary, two counts of aggravated burglary, and one count each of second degree burglary, aggravated rape, assault with intent to commit rape, and robbery. The defendant received an effective sentence of life plus 415 years (115 years at 40% and 300 years at 60%):

| | |
|---|---|
| Count One: | Burglary in the First Degree<br>Fifteen years at 40% (Range II); |
| Count Two: | Rape<br>Twenty years at 40% (Range II)<br>Consecutive with Count One; |
| Count Three: | Rape<br>Twenty years at 40% (Range II)<br>Consecutive with Count Two; |
| Count Four: | Rape |

|                      | Twenty years at 40% (Range II) Consecutive with Counts One, Two and Three; |
| Count Five:          | Rape Twenty years at 40% (Range II) Consecutive with Counts One through Four; |
| Count Six: [1]       | Burglary in the Second Degree Fifteen years at 40% (Range II) Consecutive with Counts One through Five; |
| Count Seven:         | Aggravated Rape Life imprisonment at 40% (Range II) Consecutive with Count Six; |
| Count Eight:         | Burglary in the First Degree Fifteen years at 40% (Range II) Consecutive with Count Seven; |
| Count Nine:          | Robbery Not guilty; |
| Count Ten:           | Assault with Intent to Commit Rape Ten Years at 40% (Range II) Consecutive with Count Eight; |
| Count Eleven:        | Aggravated Burglary Fifteen years at 60% (Range III) Consecutive with Count Ten; |
| Count Twelve:        | Rape Thirty years at 60% (Range III) Consecutive with Count Eleven; |
| Count Thirteen:      | Rape Thirty years at 60% (Range III) Concurrent with Counts Eleven and Twelve; |
| Count Fourteen:      | Rape Thirty years at 60% (Range III) Concurrent with Counts Eleven and Twelve; |
| Count Fifteen:       | Rape Thirty years at 60% (Range III) Concurrent with Counts Eleven and Twelve; |
| Count Sixteen:       | Rape Thirty years at 60% (Range III) Consecutive with Counts Twelve through Fifteen; |
| Count Seventeen:     | Rape Thirty years at 60% (Range III) Consecutive with Count Sixteen; |
| Count Eighteen:      | Rape Thirty years at 60% (Range III) Concurrent with Count Seventeen; |
| Count Nineteen:      | Rape Thirty years at 60% (Range III) Concurrent with Count Eighteen; |
| Count Twenty:        | Rape Thirty years at 60% (Range III) Concurrent with Count Nineteen; |
| Count Twenty–One:    | Rape Thirty years at 60% (Range III) Concurrent with Count Twenty; |

1. The original count six of the indictment was dismissed by the state. That resulted in a re-numbering of counts 6 through 31.

Count Twenty–Two:    Rape
Thirty years at 60% (Range III)
Consecutive with Count Twenty–One;

Count Twenty–Three:    Rape
Thirty years at 60% (Range III)
Consecutive with Count Twenty–Two;

Count Twenty–Four:    Rape
Thirty years at 60% (Range III)
Concurrent with Count Twenty–Three;

Count Twenty–Five:    Rape
Thirty years at 60% (Range III)
Concurrent with Count Twenty–Four;

Count Twenty–Six:    Robbery
Fifteen years at 60% (Range III)
Concurrent with Counts Twenty–One through Twenty–Five;

Count Twenty–Seven:    Aggravated Burglary
Fifteen years at 60% (Range III)
Consecutive with Counts Twenty–Three through Twenty–Six;

Count Twenty–Eight:    Rape
Thirty years at 60% (Range III)
Consecutive with Count Twenty–Seven;

Count Twenty–Nine:    Rape
Thirty years at 60% (Range III)
Consecutive with Count Twenty–Eight;

Count Thirty:    Rape
Thirty years at 60% (Range III)
Consecutive with Count Twenty–Nine.

---

In this appeal, the defendant presents six issues for review:

(1) whether the trial court erred by denying a defense motion to sever the offenses;

(2) whether the trial court erred by denying a defense motion to suppress the identification testimony of Kimberly Gugler and Jane Graham;

(3) whether the trial court erred in denying a defense motion to employ a DNA expert at state expense;

(4) whether the trial court erred by admitting the hospital records of Katherine Dobson into evidence;

(5) whether the evidence is sufficient as to count 26 of the indictment, i.e., the robbery of Kimberly Gugler; and

(6) whether the trial court erred in imposing a maximum sentence on counts one through eight and count ten or in imposing consecutive sentences on 20 of the 29 counts.

We affirm the convictions; the sentences are modified as provided.

### Counts One through Five

At approximately 5:00 A.M. September 24, 1988, Deborah Lee Doty, asleep on the living room couch of her West Nashville apartment, was awakened by an intruder. Expecting company, she had left her door unlocked. No apartment lights were on but there was a full moon and exterior lighting. Her assailant told her to be quiet, threatened to hit her, and asked for money. He then digitally penetrated the victim's vagina and directed her to the bedroom. When she struggled, he struck her head against the wall, penetrated her digitally on two more occasions, and penetrated her with his penis on one occasion. The assault lasted approximately 20 minutes.

Ms. Doty called police and was taken for an examination. Results were negative for

semen. She described penetration as minimal because the assailant did not have an erection.

Ms. Doty described her assailant as black, having short hair, about five feet eight inches tall, and approximately 160 pounds. Ms. Doty looked at two photographic lineups but made no identification. She then observed two physical lineups. In the second, she identified the defendant as her assailant. The defendant was in neither of the photographic arrays and only in the second of the two lineups. She also made an in-court identification.

This incident led to five separate convictions: first degree burglary for the entry; rape for the digital penetration in the living room; rape for the first digital penetration in the bedroom; rape for the second digital penetration in the bedroom; and rape for the penile penetration in the bedroom. The sentences, all consecutive, were 15 years, 20 years, 20 years, 20 years, and 20 years respectively. The total sentences, therefore, for this series of acts amounted to 75 years.

### Counts Six and Seven

At approximately 10:30 A.M. on October 18, 1988, Katherine Dobson was awakened in her apartment by a black man wearing pantyhose over his head. Like Ms. Doty, Ms. Dobson lived on Acklen Park Drive in West Nashville. As the assailant gagged Ms. Dobson with a scarf, she bit him. In return, he hit her in the face. As she continued to struggle, he punched her in the eye, slammed her against the wall, and placed the gag around her neck, threatening to choke her if she screamed. When the assailant digitally penetrated his victim, there was a knock on the door. Ms. Dobson freed herself and ran toward the door. Her assailant escaped through a bedroom window. Ms. Dobson described her attacker to police as a black male in his twenties, five feet eight to five feet ten inches in height, and approximately 160 pounds.

Ms. Dobson was taken by ambulance to the Vanderbilt Hospital. As a result of the attack, she suffered a black eye, a shoulder strain, and bruises to her mouth, neck, chest, shoulder, and hip. Later, Ms. Dobson and her roommate found a shirt, a pack of Kool cigarettes, and a watch, all of which had apparently been left by the assailant.

A maintenance worker observed a shirtless, black man wearing hose over his head leave the Dobson apartment from a bedroom window. Charlene Cotten, who divorced the defendant in June of 1990, testified that the defendant smoked Kool cigarettes while they were married and that she had seen him purchase a shirt "like that" found in Ms. Dobson's apartment. She stated that the defendant, on two occasions, left their residence in the early morning hours without explanation; he often stayed away from home all night on the weekends. Latent fingerprints were found on an interior door knob of Dobson's apartment and the cigarette package. Upon expert analysis, it was determined that the fingerprint on the package was that of the defendant.

Upon these facts, the defendant was convicted of second degree burglary and aggravated rape. Consecutive sentences of 15 years and life, respectively, were imposed by the trial court.

### Counts Eight through Ten

At approximately 2:30 A.M. on March 29, 1989, Mary Jane Cockerville was awakened in the bedroom of her West Nashville apartment. Her assailant placed his hand over her mouth, told her to be quiet, and started to climb into her bed. Ms. Cockerville struggled, freed herself, and called for her roommate. Startled, the assailant ran out the back door. The victim found her purse open and $10.00 to $12.00 missing. A subsequent investigation indicated that the assailant had entered the apartment by forcing open a locked kitchen window. There was a chair under the window on the outside of the residence.

The victim, who sustained several bruises and a laceration to her lip, described her assailant as a black man in his late twenties or thirties, approximately six feet tall, and with a minimum build. She said he had short hair, wore a stocking cap, and smelled "like the grime of a mechanic shop." Some 14 months later, she identified the defendant

in a lineup. At trial, Ms. Cockerville again identified the defendant as her assailant.

Based upon these events, the defendant was convicted of first degree burglary for which he received a 15–year sentence, and assault with intent to commit rape for which he received a 10–year sentence. He was acquitted on a robbery charge. The sentences were ordered to be served consecutively.

### Counts Eleven through Twenty–Six

At approximately 5:30 A.M. on April 4, 1990, Kimberly Gugler was awakened in the bedroom of her West Nashville apartment. A black male with a cloth in his hand was standing beside her bed. He covered her eyes, face, and mouth and told her not to talk. As the assailant held the victim between the wall and bed, he penetrated her vagina digitally. During the assault, he penetrated the victim's vagina with his fingers and his penis. He fondled her breasts, penetrated her rectum with his finger and penis, and performed cunnilingus. Ms. Gugler testified that her assailant penetrated her digitally "about four times" and with his penis "around five times."

After this attack, the assailant forced his victim into the hallway and asked for "lotion or grease." When she said no, he turned on the light, found some lotion, and then turned the light out. The assailant applied the lotion and vaginally penetrated the victim with both his penis and his finger: "probably twice more with his finger and once or twice more with his penis."

The ordeal lasted between 45 minutes and an hour. The assailant left through the front door. Fifty dollars had been taken from a wallet inside a backpack in the victim's living room.

Ms. Gugler testified that her assailant was a black male, five feet nine inches to five feet eleven inches in height and weighing 170 to 180 pounds. He had short hair, small ears, and smelled like a "petroleum product."

Later, Ms. Gugler helped police prepare a composite of the defendant. She was not, however, satisfied with the results. She was unable to make an identification from two photographic arrays but was able to make a positive identification at a subsequent lineup. At trial, she identified the defendant as her assailant.

For these acts, the defendant was convicted of aggravated burglary; four digital-vaginal rapes in the bedroom; five penile-vaginal rapes in the bedroom; rape by cunnilingus in the bedroom; digital-anal rape in the bedroom; and penile-anal rape in the bedroom. Additionally, there were convictions for digital-vaginal rape and penile-vaginal rape in the bathroom hallway and robbery. There was a sentence of 15 years for the aggravated burglary. Each sentence for rape was 30 years; six involved consecutive sentences. Nine of the rape sentences were concurrent. The 15–year robbery sentence was concurrent. These sentences amounted to 195 years.

### Counts Twenty–Seven through Thirty

On April 29, 1990, at about 6:30 A.M., Andrea Haygis, a student from Germany, was awakened in her West Nashville apartment by a black male intruder. When she screamed, he placed his hand over her mouth and told her to be quiet, else he would hit her. On two occasions, the assailant digitally penetrated her vagina. As she lay on her stomach, he attempted to penetrate her vagina with his penis. He then turned her over, directed her to keep her eyes closed, and attempted to penetrate both her vagina and her rectum with his penis. He was able to accomplish a vaginal penetration.

The victim described her assailant as having short hair and smelling of alcohol. Upon medical examination, sperm was found from a vaginal swab. Ms. Haygis did not get a good look at her assailant. She was unable to identify her attacker in a lineup.

Heather Horne, a resident of the apartment unit next to Ms. Haygis testified that five days before the attack, she was startled by a black male trying to break into her bedroom window. She identified the defendant as the perpetrator.

Another resident, Jane Graham, testified that she saw the defendant in the apartment complex on five separate occasions during

the two weeks prior to the assault upon Ms. Haygis. On the first occasion, about one week before the attack, the defendant was standing outside the Horne and Haygis apartment units. On the last occasion, Ms. Graham saw him looking through the window of another apartment; at that time she obtained his license number. On the day following the Haygis burglary and assault, the witness gave the information to police. She was unable to identify the defendant from a photographic array, but made a "tentative" identification in a second. Ms. Graham was able to make a positive identification of the defendant at a lineup and did so again at trial. Police found the defendant driving the vehicle with the license number supplied by this witness. The defendant was the registered owner.

After the arrest of the defendant, the police took possession of his car. A search yielded one Columbian coin and one German coin minted in 1988. Ms. Haygis reported to police that she had some German and Mexican coins in her bedside drawer at the time of her attack.

A serologist with the Tennessee Bureau of Investigation examined the semen discovered in vaginal swabs of Ms. Doty and Ms. Haygis and that found in sweat pants obtained from Ms. Gugler. She determined that Ms. Doty's assailant was a non-secreter or an A-secreter; Ms. Gugler's assailant was a non-secreter; and that Ms. Haygis' assailant was either a non-secreter or an A-secreter who is a PGM Type 2–1 (a blood antigen type), a combination which represents approximately nine percent of the population and of which the defendant is a part.

An FBI DNA analyst was unable to make a determination of the semen found on Ms. Haygis. The defendant matched three out of four probes on the semen found on Ms. Gugler's clothing. He testified that the likelihood of finding another unrelated individual, chosen at random from the population with the same "banding pattern" of the defendant would be one in four million.

For the Haygis incident, the defendant was convicted of aggravated burglary and three counts of rape. The sentences, all consecutive, were 15 years, 30 years, 30 years, and 30 years, respectively.

### Defense

It was stipulated that the defendant has a fraternal twin brother who lives in Brownsville, Tennessee, 152 miles from Nashville. He is shorter and heavier than the defendant. Sharon Edwards, the defendant's current wife, testified that she was with the defendant almost every night during the month Ms. Doty was assaulted. She stated that she was generally with the defendant on Tuesday mornings during October of 1988, when Ms. Dobson was assaulted. Mrs. Edwards stated that she worked during March of 1989, when Ms. Cockerville was assaulted, and that the defendant would have been at home with their infant son had she been at work. Upon cross-examination, Ms. Edwards stated that she could not specifically recall the defendant's whereabouts on September 24 or October 18, 1988. She admitted that the defendant was a smoker and that, among other brands, he smoked Kools.

Ira Lee Hawkins, Jr., testified that the defendant rode to work with him during April of 1990. Although he could not specifically recall April 29, the date of Ms. Haygis' assault, he could not recall an occasion when the defendant did not drive him to work. His employer's controller testified that Hawkins clocked in at 5:57 A.M. on April 29, 1990. The driving distance from Hawkins' workplace to Haygis' apartment was estimated at 10 minutes or less at that time in the morning.

### I

Before the trial, the defendant sought severance of the offenses, asking that the trial court separate the charges by date and by victim. The defendant submits that the trial court erred by denying his motion.

Rule 8(b) of the Tennessee Rules of Criminal Procedure provides for the joinder of offenses in a single indictment if the offenses constitute part of a common scheme or plan or if they are of the same or similar character. Rule 14(b)(1) provides as follows:

> If two or more offenses have been joined or consolidated for trial pursuant to Rule

8(b), the defendant shall have a right to a severance of the offenses *unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.*

(Emphasis added.)

██ While severance is ordinarily a matter which rests within the sound discretion of the trial court, that general rule is not necessarily applicable in relation to the severance of offenses. *State v. Peacock,* 638 S.W.2d 837 (Tenn.Crim.App.1982). To qualify as "parts of a common scheme or plan" within the governing rule, the offenses must be so similar in *modus operandi* and occur within such relative close proximity and time and location to each other that there can be little doubt that the offenses were committed by the same person. First, the offenses must appear to constitute part of a common scheme or plan. *Webster v. State,* 1 Tenn. Crim.App. 1, 31, 425 S.W.2d 799, 811 (1967). Secondly, the circumstances must fall within the exception to the general rule prohibiting evidence of other crimes in that they are "so related to each other that proof of one tends to establish the others." 20 Am.Jur. *Evidence* § 314 (1939); *Collard v. State,* 526 S.W.2d 112, 114 (Tenn.1975).

Rule 404 of the Tennessee Rules of Evidence is pertinent:

(b) Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with the character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

██ The general rule prohibiting evidence of other crimes has several exceptions. Proof of a common scheme or plan is one of those. The procedure outlined in the rule requires a jury-out hearing, a finding that the "other act" addresses a relevant issue such as common scheme or plan, and a balancing of probative value against unfair prejudicial effect. Factors in weighing the probative value include the prosecution's need for the evidence, the likelihood the defendant committed the other crimes, and the degree of its relevance. The similarity of the acts makes the probative value particularly significant. Generally, the common scheme or plan is used to prove identity. N. Cohen, D. Paine, S. Sheppeard, *Tennessee Law of Evidence* § 404.11 (2d ed. 1990). The distinctive design in the commission of a series of crimes may serve as the basis for either admitting evidence of other crimes or having consolidated trials.

Our analysis of the variety of Tennessee cases dealing with this particular issue begins with the general description of the exception to the rule:

[T]he law permits proof of a plan or scheme to commit a series of crimes including the one for which the accused is being tried, and, as tending to show the existence of such plan or scheme, it allows testimony of the commission of crimes other than the one charged, but *so related in character, time, and place of commission* as to tend to support the conclusion that there was a plan or system which embraced both them and the crime which is charged.

20 Am.Jur. *Evidence* § 314 (1939); 638 S.W.2d at 840 (emphasis added).

Another treatise suggests the common scheme exception is particularly applicable to the "signature" crime. That is, *the uniqueness of the method used* in the commission of the crimes is the test of admissibility. *McCormick on Evidence* 560 (E. Cleary ed. 3d ed. 1984) (emphasis added).

In *Warren v. State,* 178 Tenn. 157, 156 S.W.2d 416 (1941), our Supreme Court applied the common scheme and plan exception to the general rule (precluding the admission of other crimes) when the single issue was

one of identity. The court upheld a conviction based in great measure upon this testimony:

> [A witness] testified that a few nights [after the robbery at issue], at about the same locality and about the same time of night [the second victims'] car was approached and held up and they were robbed by a man dressed in a black cap and overalls, with his face smeared with dark grease or paint carrying a pistol in one hand and a flashlight in the other, who had an impediment in his speech.

156 S.W.2d at 417.

The court determined that the evidence was properly admitted because the state had met two main conditions:

> (1) the similarity of the circumstances of the commission of the two offenses as to afford evidence of identity;
> (2) the testimony was pertinent, necessary, and reasonably required to establish the defendant as the perpetrator.

In 1950, the Supreme Court reached a different result in an appeal from a conviction of rape. *Harris v. State*, 189 Tenn. 635, 227 S.W.2d 8 (1950). The charge was that the defendant met his victim on the street, put his arm around her, held a weapon to the back of her neck, and threatened to kill her if she resisted. She was forced to go to a park and then raped. The court held that the trial court had erroneously admitted evidence of a separate crime committed one week earlier under similar circumstances:

> [T]he crimes were a week apart in time. They were both rapes and both were committed by coercion. In each instance the witness thought that a knife had been used although neither was able to say she had seen the knife. The two crimes were not committed at the same place. The methods pursued were not so peculiar as to render it unlikely that lustful men bent upon the crime of rape might not have pursued identical methods. There was ... lack of similarity in the manner in which criminal lust manifested itself in the two instances....

227 S.W.2d at 11.

In the *Harris* case, the Supreme Court made the following observation with respect to the holding in *Warren:*

It is probable that the black paint or grease smeared over his face was considered such an unusual thing that this, in connection with the other circumstances, warranted the admission of the identifying evidence to justify a conclusion that the man who committed one crime was the man guilty of the other.

*Id.* at 11–12.

The *Harris* court stated that *Warren* "still marks the boundaries beyond which this court has not been willing to go ...." *Id.*

This court addressed the issue in *White v. State*, 533 S.W.2d 735 (Tenn.Crim.App.1975). In a lengthy analysis authored by former Presiding Judge Duncan, the court approved a conviction of rape when a part of the state's evidence was that the defendant had committed two prior, similar rapes within two months of that for which the defendant stood trial. The purpose of the testimony was to establish the defendant's identity and course of conduct. Similarities of the crimes were that the defendant used a knife, forced his victim into the back seat of his vehicle, required them to disrobe, discussed drugs, and allowed the victims to use tissue. Two of the three victims had their glasses removed and were beaten. In each of the three instances, the defendant traveled in his car with the victims, took their purses, and released them onto the street. Our court held that these rapes were so "strikingly similar that there [could] be no other conclusion than the fact that the defendant committed all three...." 533 S.W.2d at 741.

In 1980, the Supreme Court permitted evidence of another crime in the prosecution of an armed robbery on the issue of identity. While acknowledging the general rule that the evidence was inadmissible based upon irrelevancy and obvious prejudice, the court reaffirmed the exception to the rule:

> [T]he *modus operandi* of the other crime and of the crime on trial must be substantially identical *and must be so unique* that proof that the defendant committed the other offense fairly tends to establish that

he also committed the offense with which he is charged.

*Bunch v. State,* 605 S.W.2d 227, 230 (Tenn. 1980) (emphasis in original). In that case, the two robberies were similar in a number of ways:

(1) they were accomplished by three robbers consisting of two men and one woman;

(2) the victims were placed in restrooms;

(3) the two businesses were in close proximity; and

(4) they occurred on the same day, one at 11:30 A.M. and the other at 3:30 P.M.

The court explained its conclusion in the following way:

[I]t is not necessary that the other crime be identical in every detail to the offense on trial; *it is sufficient if evidence of the other crime supports the inference* that the perpetrator of it, shown to be the defendant, is the same person who committed the offense on trial.

*Id.* at 231 (emphasis added).

In 1982, our court upheld the denial of a request to sever several counts of the indictment. *State v. Peacock,* 638 S.W.2d 837 (1982). Our court held that the "mere fact that a defendant has committed a series of armed robberies, ... rapes, or ... other crimes does not mean they are part of a common scheme or plan...." *Id.* at 840. The similarities qualifying the admission of the evidence as an exception to the general rule were described as follows:

[I]n all three robberies the appellant first knocked on the doors to the houses before entering. He demanded money, drugs and jewelry. In each case appellant forced his victims to disrobe. He used a pistol during all the robberies, and he repeatedly told his victims to not look at his face or he would shoot them. Appellant warned his victims that if they called the police he would return to shoot them.... [T]he victims' residences were in relatively close proximity.... Appellant committed sexual offenses at two of the three residences.

*Id.* at 838.

Presiding Judge Walker, writing for the court, concluded that the evidence of each would be admissible in the trials of the others and that the motion for severance had been properly denied.

In *State v. Wooden,* 658 S.W.2d 553 (Tenn. Crim.App.1983), our court upheld the admission of evidence of other sex crimes on the basis that the offenses "were so similar in *modus operandi* and occurred within such a close proximity of time and location as to satisfy the requirement for joinder." *Id.* at 558. The similarities were as follows:

(1) the victim was a young, white female who lived in an apartment complex and was alone at the time of the offense;

(2) the attacker was in the apartment when the victim arrived or would enter shortly thereafter;

(3) the attacker took precautions against the victim seeing his face;

(4) the attacker performed cunnilingus before penile/vaginal rape; then required his victims to rub his nipples;

(5) the offenses took place over a period of nineteen months within apartment complexes in close proximity to each other.

In *State v. Rounsaville,* 701 S.W.2d 817 (Tenn.1985), our court again considered the subject. It reversed and remanded a conviction based upon the trial court's erroneous admission of evidence that the defendant, two days before a forgery for which he was on trial, had attempted to pass a forged instrument at the same bank. The court held that evidence of prior offenses was rarely admissible. It found no peculiar circumstances establishing a common scheme or plan. It found the evidence "only remotely relevant," more prejudicial than probative, and tending to establish propensity rather than identity. *Id.* at 820–821.

Using these numerous authorities from our court and the Tennessee Supreme Court, it appears that the trial court did not err in refusing to sever the charges. The facts in *White, Bunch, Peacock,* and *Wooden* were similar to those here. Here, the victims were white females between 21 and 24 years of age. The attacks took place in either apartment complexes or duplexes within a two-mile radius in the West Nash-

ville area. Each of the victims was alone or appeared to be alone at the time of the attack. All were asleep. Each incident involved a burglary before the rape. All units were on the first floor. On every occasion, the assailant instructed the victims to remain quiet; rubbed the victims' breasts; and digitally penetrated the victims' vaginas. In those instances the attack was not interrupted, the assailant either attempted or completed vaginal intercourse. Generally, the assailant either sought or took money. The crimes occurred within a 20–month period.

Taken individually, these similarities do not appear to be particularly unique. The collective similarities, however, strengthen the position of the state. There were differences, as the defendant points out; yet it is not necessary that the other crimes be identical in every detail. When weighed against the number of similarities, those few differences do not circumvent the application of the exception to the general rule. In our view, the circumstances established such a distinctive design that evidence of each of the crimes could be used in the prosecution of the other. There was sufficient uniqueness in the method. In our view, the trial court acted within the boundaries of its discretion in denying the motion to sever.

## II

Next, the defendant argues that the trial court should have suppressed the identification testimony of both Ms. Gugler, a victim, and Jane Graham, a state's witness on both counts arising out of the assault of Ms. Haygis. The procedure in each instance, the defendant asserts, was so suggestive as to violate his right to due process. U.S. Const. amend. V; Tenn. Const. art. I, § 9. The defendant notes that the witnesses had been unable to identify his photograph from an array before making positive identifications from physical lineups. Other than the defendant, none of those in the photographic array were present when the witnesses viewed the lineup.

Ms. Gugler testified that she helped police make a composite on the date of her assault. The first photographic array she observed did not include the defendant's picture. The

second array did. Afterward, she made an unqualified identification in a physical lineup.

Ms. Graham, unable to make an identification of the defendant's photograph from an array, made a tentative identification of the defendant in a second photographic array. Later, she made a positive identification in a physical lineup.

Both witnesses stated that the police made no suggestions. The police officer conducting the investigation explained that the arrays initially presented to each of the witnesses contained an eight-year-old photo of the defendant. In a second array, Ms. Graham tentatively identified a more recent photograph. A comparison of the 1982 and the 1990 photographs indicate a change in the physical appearance of the defendant.

■ To be unconstitutional, the identification procedure must have been conducted in such an impermissibly suggestive manner that it created a substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court stated that a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar. *See Shye v. State,* 506 S.W.2d 169 (Tenn.Crim.App. 1973); *Young v. State,* 566 S.W.2d 895 (Tenn. Crim.App.1978). In *State v. Via,* 146 Ariz. 108, 704 P.2d 238 (1985), the Arizona Supreme Court considered circumstances similar to these. The witness was unable to positively identify the defendant in a photographic lineup but could do so in a subsequent physical lineup. The identification was held to be unduly suggestive. 704 P.2d at 249.

In *State v. Witt,* 310 Minn. 211, 245 N.W.2d 612, 615 (1976), the Supreme Court of Minnesota held as follows:

If suspicion has focused on a particular individual and his picture is shown to the complainant along with others but the complainant does not identify the picture, a subsequent lineup, even though otherwise proper, is open to question when that individual is the only person in the lineup

whose picture has recently been shown to the complainant. *It would be a better practice in such a situation to eliminate the use of photos and proceed directly to the lineup, or to include in the group of pictures shown at least one or more pictures of persons other than the suspect who also subsequently appear in the lineup.*

(Emphasis added).

■ The view expressed in *Witt* has merit. The procedure used did not, however, cause reversible error in that case. Similarly, we find no reversible error here.

In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), our Supreme Court held that an identification procedure, even though suggestive, will not negate the identification of the defendant when the identification procedure is nonetheless reliable. The controlling factors are as follows:

(1) the opportunity of the witness to view the criminal at the time of the offense;

(2) the witness' degree of attention;

(3) the accuracy of the witness' prior description of the individual;

(4) the level of certainty demonstrated by the witness at the confrontation; and

(5) the time between the crime and the confrontation.

*Id.* at 199, 93 S.Ct. at 382.

Our state has specifically adopted these guidelines. *Bennett v. State,* 530 S.W.2d 511, 514 (Tenn.1975); *Forbes v. State,* 559 S.W.2d 318, 322–23 (Tenn.1977).

As to this case, the factors weigh favorably towards admissibility. Ms. Gugler, for example, had at least 45 minutes within which to view her assailant. Although it was dark, there was some light coming into the room and she had a clear look for several seconds. Ms. Graham encountered the defendant on several occasions; she was aroused by suspicion in each instance.

Neither of the witnesses were casual observers. Ms. Gugler was, of course, the victim of several offenses. Ms. Graham was so suspicious that she took a license number.

Each of the two witnesses was able to describe the defendant. Ms. Gugler's de-

scription was accurate. Ms. Graham's was too general, however, for this factor to weigh favorably for the state.

Although both Ms. Gugler and Ms. Graham failed to make positive identifications from photographic arrays, they were absolutely certain during the physical lineup. Ms. Gugler identified the defendant as her assailant "beyond a shadow of a doubt." Ms. Graham said that he was "easy to identify."

The final factor is the length of time between the offense and the confrontation. There was a month and a half delay in the case of Ms. Gugler. It was less than a month in the case of Ms. Graham. In *Forbes,* our Supreme Court held a span of 98 days to be within close proximity and thus favoring admissibility. By the use of that standard, the factor weighs favorably for the state in this case.

The procedures used were somewhat suggestive. More so, perhaps, in the case of Ms. Graham. By the application of the *Neil v. Biggers* factors, however, we find that the identification by each witness was reliable, therefore admissible, and not in contravention of the defendant's right to due process.

### III

The state had a deoxyribonucleic acid (DNA) expert to testify. The defendant contends the trial court erred by failing to authorize funds for the defendant to employ his own expert as to counts 11 through 26 (victim Gugler). The charges resulted in convictions for aggravated burglary, robbery, and 14 counts of rape. The defendant asserts that the trial court's denial deprived him of his right to due process of law and that he should be granted a new trial as to each of the 14 convictions.

DNA, found in every organism, is present in the cells of all human bodily fluids. A chromosome is made up of DNA and carries the body's genetic information. Each DNA pattern is unique. That is why people look different from each other. The Restriction Fragment Length Polymorphism Procedure (RFLP) is used to identify an individual by his body fluid. Chemicals can be applied to a stain to remove DNA. When a DNA mole-

cule is extracted from a cell, its strands are cut by the use of special enzymes and are then placed on an electrically-charged gel. The negatively charged DNA then separates. Probes are used to locate and bind with parts of the DNA. If a probe does not bind, radioactivity accumulates. Finally, an x-ray is made of the accumulations of radioactivity. The patterns of binds are similar in appearance to product bar codes. That pattern formed from the suspect is then compared with that taken from the body fluid found at the scene of the crime. If the body fluid is from the same person, the patterns should match. The statistical probability of someone having the same DNA pattern can be determined by comparison of the suspect's DNA profile with that of a known group of other samples. *See* Comment, *Spencer v. Commonwealth and Recent Developments in the Admissibility of DNA Fingerprint Evidence,* 76 Va.L.Rev. 853 (1990).

The defendant relies upon *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In that case, the Supreme Court held that an indigent defendant's right to due process had been violated by a denial of funds to employ a psychiatrist. The court held that the defendant had made a threshold showing of mental instability at the time of the offense likely "to be a significant factor at trial." 470 U.S. at 83, 105 S.Ct. at 1096. That *Ake* was a capital case may have played a part in the court's decision. *See State v. Lambert,* 741 S.W.2d 127, 131 (Tenn.Crim.App.1987).

Before attempting to resolve the issue presented for review here, we will attempt to review those recent Tennessee cases that might place the subject in proper context. Prior to the *Ake* holding, our Supreme Court had held that an indigent defendant had no right, under either the federal or state constitutions, to the services of a private psychiatrist at state expense. *Graham v. State,* 547 S.W.2d 531, 535–36 (Tenn.1977). It had also refused to authorize funds for an indigent defendant to employ an expert in the field of hair analysis. *State v. Williams,* 657 S.W.2d 405, 411 (Tenn.1983). In *Williams,* the court held that the provision of funds for the defense was a matter of discretion for the legislature.

The holding in *Ake* came down two years after *Williams.* The defendant had as his sole defense that he was insane at the time of the crime. The trial court denied a defense request for a psychiatric examination. The defendant was convicted and sentenced to death. Justice Marshall delivered the opinion for the court:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist. . . .

470 U.S. at 83, 105 S.Ct. at 1096.

In *State v. Evans,* 710 S.W.2d 530 (Tenn. Crim.App.1985), our court approved the trial court's denial of a ballistics expert to an indigent defendant. In an opinion written by former Presiding Judge Duncan, this court found the circumstances distinguishable from *Ake:*

> (1) the defendant made no preliminary showing that the expert was needed to assist him in his defense;
>
> (2) the state offered a reliable, unchallenged expert regarding the ballistics tests that were made while in *Ake* there was no expert testimony whatsoever regarding his mental state; the record established nothing to indicate any unreliability in the tests.
>
> (3) *Ake* was presumed sane unless he presented evidence to raise reasonable doubt of his sanity.

In *State v. Wright,* 756 S.W.2d 669 (Tenn. 1988), a death penalty case, the Supreme Court approved the trial court's denial of funds for an indigent defendant to employ an expert witness in the reconstruction of crime

scenes. The court held that other demonstrable evidence helped depict the crime scene, the nature of the wounds, and the location of the bodies of the two victims. It held that the defendant had not demonstrated how the expert could have provided assistance with the defense theory.

In 1989, the Supreme Court considered an *Ake* issue in *State v. Taylor*, 771 S.W.2d 387 (Tenn.1989). The timeliness of the appointment of a psychiatrist was, however, the specific issue and the court determined that the requirement of fundamental fairness had been met. In *State v. Teel*, 793 S.W.2d 236 (Tenn.1990), the Supreme Court considered for the first time a request for a DNA expert. Because the defendant did not make the request until the motion for new trial and failed to present any evidence suggesting that a DNA test would produce admissible evidence, the court upheld the trial court's denial of an expert.

■ In 1991, our legislature recognized the admissibility of DNA evidence:

**DNA analysis—Admissibility in evidence.**—(a) As used in this section, unless the context otherwise requires, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes.

(b)(1) In any civil or criminal trial, hearing or proceeding, the results of DNA analysis, as defined in subsection (a), are admissible in evidence without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material upon a showing that the offered testimony meets the standards of admissibility set forth in the Tennessee Rules of Evidence.

Tenn.Code Ann. § 24–7–117. We note that the General Assembly has not authorized funds for experts in non-capital cases. Tenn. Code Ann. § 40–14–207(b). Otherwise, the trial court does not have authority to authorize a defense expert absent a threshold showing of deprivation of due process. That, of course, is the claim of the defense here. Due in part, perhaps, to the expense involved, it appears that courts of our state have been reluctant to appoint experts for indigent defendants, especially in non-capital cases. Constitutional due process, however, applies whether the death penalty is sought or not. The test, we think, is whether the indigent defendant has demonstrated before trial the necessity of expert assistance upon an issue likely to be significant at trial. The burden is upon the defendant to establish that the expert would be of material assistance in the establishment of his defense theory:

[M]ere hope or suspicion that favorable evidence is available is not enough to require that such help be provided.

*State v. Parks*, 331 N.C. 649, 658, 417 S.E.2d 467, 472 (1992) (quoting *State v. Holden*, 321 N.C. 125, 136, 362 S.E.2d 513, 522 (1987)).

■ The standard must be flexible and determined on a case-by-case basis. Whether a defendant has adequately established a particularized necessity in his case is a matter left to the sound discretion of the trial judge. The facts and circumstances known at the time the motion for expert assistance is made control. *See State v. Moore*, 321 N.C. 327, 335–36, 364 S.E.2d 648, 652 (1988).

Here, the defendant made a written motion to "retain an expert in the field of DNA identification to assist in his defense." The memorandum of law in support of the motion insightfully points out that the ruling in *Ake* is not limited to psychiatrists but extends to other experts and effectually argues that the passage of the Tennessee statute authorizing DNA evidence should logically warrant, in the proper case, the employment of such an expert for the defense. The defendant summarizes his need as follows:

The assistance of a DNA expert is crucial to the defendant in this case. DNA printing is a highly complex process which only a trained expert fully understands. Without this understanding, defense counsel cannot properly prepare for trial, or understand appropriate avenues to question results or cross-examine experts testifying for the prosecution. Without special training, the defense counsel would be at the mercy of the prosecutor's expert, unable to

discern weaknesses in the procedures used or in the interpretation of results.

We point out, however, that following this statement, the memorandum contains an extensive discussion of DNA technology, including a citation of authorities and the extent to which mathematical probabilities are available for both whites and blacks. The defendant provided as an example one instance of a defendant improperly convicted based upon DNA identification testimony; the identification later proved to be erroneous.

In a similar case in which the defendant generally sought the help of experts and specifically asked for funds for an independent DNA analysis, a North Carolina court upheld the trial court's denial of the request:

> While defendant did show that appointment of the experts might help him in general at trial, he did not do so with the degree of particularity required.... [The] defendant's showing demonstrates no more than a general desire to have an expert assist him in some vague manner in the event that DNA evidence might be introduced at trial.... We hold, therefore, that at the time the motion was made, the facts and circumstances known to the trial court did not amount to threshold showing of particularized necessity.

*State v. Mills,* 332 N.C. 392, 420 S.E.2d 114, 118–19 (1992) (citations omitted).

In an unreported case from our court, a DNA expert was denied on the basis that the defense had failed to disclose its theory at the time of the request; thus, there had been no threshold showing of the need to appoint the expert. *State v. Larry B. Harris,* 866 S.W.2d 583 (Tenn.Crim.App.1992). The motion asserted that an expert was necessary to "advise us, inform us regarding the DNA evidence the state would seek to introduce."

In this instance, while identity was an obvious issue, the record does not indicate that the defendant supplemented his pre-trial request by affidavit or any other tender of proof sufficient, in our view, to have established that "preliminary, particularized need"

for a DNA expert. To have done so may have required a disclosure of the defense, proof, and some indication of the potential misidentification as to specific charges. Oral argument addressed more the admissibility of DNA rather than any due process entitlement for expert assistance.

We hold that the defendant failed to meet the minimum threshold of particular need. The stated desire for "assist[ance] in his defense" or for "inform[ation] regarding the DNA evidence the state would seek to introduce" was too general in nature. At the time of the request, the circumstances did not adequately establish "particularized necessity" for a DNA expert.

As an aside, we acknowledge the diligent preparation by defense counsel. It is evidenced by the quality of the memorandum of law filed on behalf of the defendant. The cross-examination of the state's DNA expert was both knowledgeable and effective. That the victim made a positive identification of the defendant at both the lineup and the trial, however, weighed heavily in favor of conviction. The state's DNA expert provided helpful but cumulative testimony.

## IV

The defendant next contends that the trial court erred by admitting into evidence the hospital records of Katherine Dobson, the victim in counts six and seven. The documents were admitted through a legal supervisor of the medical records department at Vanderbilt University Medical Center. None of the medical personnel who examined the victim testified at trial.

The state initially alleges that the objection was too general and that the issue has thus been waived. The record demonstrates, however, that the defendant objected, alleging that there was no "exception to the hearsay rule whether this document was created by a doctor" as treatment and diagnosis. The trial court ruled that the records would be admissible under the medical diagnosis and treatment exception as well as the exception for records of regularly conducted activity.

The following is an exception to the rule against hearsay:

> *Statements for Purposes of Medical Diagnosis and Treatment.*—Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

Tenn.R.Evid. 803(4).

■ These statements are generally considered reliable because they are made by a patient with a genuine desire to seek adequate medical treatment. The motive to get better physically generally outweighs any other considerations. N. Cohen, D. Paine, and S. Sheppeard, *Tennessee Law of Evidence* § 803(4).1 (2d ed. 1990).

■ As a prerequisite to the admission of this particular hearsay statement, the state must have established that it (1) was made for the purpose of medical diagnosis and treatment; (2) describes the medical history of the declarant, i.e., past or present symptoms, pain, sensations, and the general character of the cause of the symptoms; and (3) is reasonably pertinent to diagnosis and treatment. *Id.*, 803(4).2 through 803(4).4.

■ The records at issue reflected that Katherine Dobson was treated at the hospital for multiple bruises sustained in an "assault and attempted rape"; the report indicates that the victim reported a digital vaginal penetration. Those portions of the medical history which bear no relationship to diagnosis and treatment should be excluded. We hold, however, that it was proper for the physician to determine whether there was an intrusion during the assault of any orifice. That was reasonably pertinent to determine the area of examination and what treatment, if any, to provide. The responses by Ms. Dobson relate to diagnosis and treatment. The degree of reliability envisioned by the rule permitting such hearsay was, in our view, present.

It is apparent that the separation of that which relates to diagnosis and treatment, both of which must be present in order for hearsay to be admissible, and that which does not is a difficult task indeed. The trial court should be provided some degree of discretion in making that determination. Although treatment to the area may prove to be unnecessary, that the statement was made *for the purpose of* diagnosis is sufficient to satisfy the rule. (Emphasis added.) In this instance, we hold that the trial court properly exercised that discretion.

■ Even if the admission of this evidence had been error, we think it was harmless. In *State v. Horne*, 652 S.W.2d 916 (Tenn.Crim.App.1983), our court held that errors in the admission of evidence are not generally grounds of reversal and will not result in a reversal of a conviction "unless it shall affirmatively appear that the alleged error affected the result of the trial." *Id.* at 919. In this instance, Ms. Dobson had testified to the nature of the assault, i.e., a digital penetration. Further, the trial court instructed the jury that the evidence was not being offered for the truth of it but as to what was actually recorded. Under these circumstances, we think the evidence at issue had little bearing on the outcome of the charges in counts 6 and 7.

## V

The defendant next contends that the evidence was insufficient to convict in count 26 of the indictment, the robbery of Ms. Gugler. We disagree.

The victim testified that the defendant had taken $50.00 from a wallet which was located inside a backpack in her living room:

> I don't know how he got where my wallet was, but anyway he got it within a matter of minutes. He got my money and put the wallet back inside the backpack and he zipped it back up.

Tenn.Code Ann. § 39-13-401 defines robbery, a Class C felony, as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." The defendant asserts that the victim's testimony failed to establish the requisite element of violence or fear.

Ms. Gugler testified that she was awakened by a man standing next to her bed. During the assault, the victim struggled. When she did so, the defendant threatened to hurt her. She was under his physical control when the assault continued from the bedroom to the hallway. At the conclusion of the assault, the defendant ordered the victim into the bathroom, told her to lock the door and stay there. She remained in the bathroom "a few minutes" until she heard the front door slam. She then called police.

■ On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn.1978). The relevant question is whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979); Tenn.R.App.P. 13(e).

■ Circumstantial evidence established the theft. The victim testified that the money was there when the defendant arrived and was gone immediately after he left. Although the victim did not know how or when the theft took place, that does not mean, as the defendant suggests, that the theft was not accomplished "by violence or putting the person in fear." If the circumstances of the theft are attendant to a reasonable apprehension of danger sufficient to "induce a man to part with his property for the sake of his person," the crime is robbery. *Sloan v. State,* 491 S.W.2d 858, 861 (Tenn.Crim.App. 1972) (quoting 77 C.J.S. *Robbery* § 16).

■ Here, Ms. Gugler was gagged, pinned against the wall, raped, manhandled, and ordered to lock herself in her bathroom. These circumstances, in our view, established an atmosphere of intimidation, likely to create an apprehension of danger, and, therefore, sufficient to establish the element necessary to elevate the offense from theft to robbery. Moreover, a robbery may be actual or constructive:

It is actual when the taking is immediately from the person; and constructive when in the possession or in the presence of the party robbed.

*Morgan v. State,* 220 Tenn. 247, 415 S.W.2d 879, 881 (1967); *see Jones v. State,* 214 Tenn. 683, 383 S.W.2d 20, 23 (1964). While constructive in this instance, there was nonetheless a robbery.

VI

The defendant contends that the ultimate sentence was excessive. He argues that the trial court erred in the application of the enhancement factors in imposing maximum terms on counts one through eight and count ten. He also claims that the trial court erred by the imposition of consecutive sentencing in 20 of the 29 counts.

■ The crimes that resulted in convictions on counts 1, 2, 3, 4, 5, 6, 7, 8 and 10 occurred before November 1, 1989. The defendant was sentenced afterwards. Even under these circumstances, when a challenge is made to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn.Code Ann. § 40–35–401(d). That standard of review applies to all counts, whether the convictions were before or after November 1, 1989. *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Id.* at 169. The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

■ Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn.Code Ann. §§ 40–35–102, – 103, and –210; *State v. Smith,* 735 S.W.2d 859, 863 (Tenn.Crim.App.1987).

Under the 1982 Act, an especially aggravated and persistent offender received a Range II sentence. Tenn.Code Ann. § 40-35-109(c) (1982). As such, the trial court was required to impose sentences of at least "the minimum sentence plus one-half (½) of the difference between the maximum sentence and the minimum sentence ...." Tenn.Code Ann. § 40-35-109(b) (1982). As to counts one through eight and count ten, the trial court imposed the maximum possible sentence:

| Count | Range of Sentence | Sentence |
|---|---|---|
| 1 (burglary in first degree) | 10 to 15 years | 15 years |
| 2 (rape) | 13 years | 20 years |
| 3 (rape) | 13 years | 20 years |
| 4 (rape) | 13 years | 20 years |
| 5 (rape) | 13 years | 20 years |
| 6 (burglary in second degree) | 9 to 15 years | 15 years |
| 7 (aggravated rape) | 40 years to life | Life |
| 8 (burglary in first degree) | 10 to 15 years | 15 years |
| 10 (assault with intent to commit rape) | 6 to 10 years | 10 years |

■ The trial court sentenced the defendant on December 13, 1991. As previously indicated, our Supreme Court held in *Ashby* that there was no violation of the *ex post facto* provision of art. I, § 10 of the United States Constitution by the application of the presumptive correctness standard of review to offenses committed prior to November 1, 1989, if the sentences occurred after that date. There were other *ex post facto* considerations:

Unless prohibited by the United States or Tennessee Constitution, any person sentenced on or after November 1, 1989, for an offense committed between July 1, 1982, and November 1, 1989, shall be sentenced under the provisions of this chapter.

Tenn.Code Ann. § 40-35-117(b) (1989).

■ Because of the *ex post facto* provisions of the United States and Tennessee Constitutions,[2] the penalty imposed for an offense committed prior to the effective date of the new act cannot be greater than that provided by the Criminal Sentencing Reform Act of 1982. *See* Tenn. Const. art. I, § 11. In *Beazell v. Ohio*, 269 U.S. 167, 169-170, 46 S.Ct. 68, 70 L.Ed. 216 (1925), the United States Supreme Court defined the characteristics of an *ex post facto* law:

[A]ny statute which punishes as a crime an act previously committed, which was inno-

cent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with [a] crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.

In consideration of these constitutional guidelines, the legislature passed the following statute as a part of the 1989 Act:

39-11-112. ***Repealed or amended laws— Application in prosecution for offense.***— Whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense. Except as provided under the provisions of § 40-35-117, in the event the subsequent act provides for a lesser penalty, *any punishment imposed shall be in accordance with the subsequent act.*

(Emphasis added.)

■ Had the offenses described in counts one through eight and ten occurred after November 1, 1989, each of the sentences would have been greater because of the de-

---

**2.** In *Miller v. State*, 584 S.W.2d 758 (Tenn.1979), our Supreme Court suggested that the Tennessee

Constitution provision is broader than its federal counterpart.

fendant's status as a career offender (automatic maximum within the range):

| Count | Class | Sentence |
|---|---|---|
| 1 (burglary in first degree) | C | 15 years |
| 2 (rape) | B | 30 years |
| 3 (rape) | B | 30 years |
| 4 (rape) | B | 30 years |
| 5 (rape) | B | 30 years |
| 6 (burglary in second degree) | C | 15 years |
| 7 (aggravated rape) | A | 60 years |
| 8 (burglary in first degree) | C | 15 years |
| 10 (assault with intent to commit rape) | C | 15 years |

In consequence, the trial court properly used the 1982 Act to establish the sentence as to each of these counts.

■■■ As to count one, the state concedes that the trial court erred by determining that the defendant treated the victim with exceptional cruelty during the commission of the burglary offense. Tenn.Code Ann. § 40–35–111(5). As to the burglary itself, we agree. There were, however, other enhancement factors properly applied: (1) a previous history of criminal convictions or criminal behavior; (7) the offense was committed to gratify the defendant's desire for pleasure or excitement; and (8) the defendant had a previous history of unwillingness to comply with conditions of a sentence involving release. Tenn.Code Ann. § 40–35–111. The defendant's criminal record was placed into evidence during the sentencing hearing. Circumstances suggest that the defendant committed the burglary with the intent to rape. Further, the defendant was on parole at the time the Doty residence was burglarized. The defendant cites *State v. Avery*, 818 S.W.2d 365, 369 (Tenn.Crim.App.1991), for the proposition that Tenn.Code Ann. § 40–35–111(10), the risk to human life was high, precludes the use of this enhancement for a burglary. We disagree. Basically, it depends upon the circumstances of the crime. In *Avery*, there was no occupant; theft was the purpose of the burglary. These circumstances are different. In our view, they involved a risk to human life. Use of the factor was proper.

In summary, there were four enhancement factors applicable. There were no mitigating factors. Tenn.Code Ann. § 40–35–110 (1982). Upon review of all of the pertinent sentencing considerations, we fully approve of the maximum sentence on count one. The same rationale applies to count six, a burglary in the second degree, and count eight, a burglary in the first degree. Based upon all appropriate sentencing considerations, the defendant has not overcome the presumptive correctness of the trial court's determination that the maximum sentence was justified on these counts.

As to counts two, three, four, five, seven, and ten, the trial court properly applied the following enhancement factors: (1) previous history of criminal convictions; (7) the crime involved a victim and was committed for pleasure or excitement; and (8) a previous history of unwillingness to comply with conditions of release.

■■■ Although there is some inconsistency in the application of Tenn.Code Ann. § 40–35–111(7) to the offense of rape, the prevailing trend is to permit the use of this enhancement unless it is the single enhancement factor. *State v. Scott*, 735 S.W.2d 825, 830 (Tenn.Crim.App.1987). Certainly other enhancement factors were present. Circumstances suggest the defendant committed the crimes for sexual pleasure and excitement.

■■■ The state concedes that the trial court erroneously applied Tenn.Code Ann. § 40–35–111(5), exceptional cruelty, and (10), high risk to human life to count two. It concedes that the trial court erroneously applied Tenn.Code Ann. § 40–35–111(5), exceptional cruelty, to counts three, four and five.

We also hold that Tenn.Code Ann. § 40–35–111(10), risk to human life high, does not apply in counts three, four, and five. The trial court based its application of that factor on the potential for a sexually transmitted disease; there was not, however, any evidence that the defendant was so afflicted. Because, however, there were three appropriate enhancements and no mitigating factors, we find the imposition of the maximum sentence appropriate. Enhancement factors have no specific, assigned weight. From our review of all appropriate sentencing considerations, we approve of the sentences imposed by the trial court on counts two, three, four, and five.

■■■ As to counts seven and ten, Tenn. Code Ann. § 40–35–111(1), (7), and (8), properly apply; however, we find that neither enhancements (5) nor (10) apply. The rape of Ms. Dobson, wherein the defendant gagged, threatened and struck the victim, was cruel but not exceptionally so within the guidelines established in *State v. David Patrick Pearson*, No. 03C01–9103–CR–00087, 1992 WL 70547 (Tenn.Crim.App., Knoxville, April 9, 1992). Nonetheless, there were three enhancement factors and no mitigating factors. Upon the application of the appropriate enhancement factors, the circumstances of the offense, and other sentencing considerations, this court approves of the imposition of maximum sentences to counts seven and ten.

In summary, we find that the trial court erred by the application of a number of the enhancement factors in determining the sentences for counts one, two, three, four, five, six, seven, eight, and ten. Because, however, of the number of enhancements remaining as to each count, the lack of mitigating factors, the principles of sentencing, and other statutorily-authorized considerations, we find that the presumptive correctness of the sentence prevails in each instance. Tenn.Code Ann. § 40–35–210.

Now we turn to the issue of consecutive sentencing. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, classifications qualifying one for a consecutive sentence were first set out in *Gray v. State*, 538 S.W.2d 391 (Tenn.1976):

(1) the persistent offender, defined as one who has previously been convicted of two felonies or of one felony and two misdemeanors committed at different times when he was over eighteen (18) years of age;

(2) the professional criminal, one who has knowingly devoted himself to criminal acts as a major source of livelihood or who has substantial income or resources not shown to be derived from a source other than criminal activity;

(3) the multiple offender, one whose record of criminal activity is extensive;

(4) the dangerous mentally abnormal person, so declared by a competent psychiatrist who concludes as a result of a presentence investigation that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior or by persistent aggressive behavior with heedless indifference to consequences; and

(5) the dangerous offender, ... if the crimes for which he is convicted indicate that he has little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

*Id.* at 393.

In *Gray*, our Supreme Court held that aggravating circumstances must be present before placement in any one of the classifications:

This does not mean that all defendants convicted of several counts of a dangerous offense, such as armed robbery, should be consecutively sentenced. Even though armed robbery is a dangerous offense, there are increased penalties for that crime. The decision to impose consecutive sentences when crimes inherently dangerous are involved should be based upon the presence of aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed.

*Id.*

In *State v. Taylor*, 739 S.W.2d 227 (Tenn. 1987), the Supreme Court established an additional category for those "defendants con-

victed of two or more statutory offenses that involve sexual abuse of minors." *Id.* at 230. The court cautioned, however, that in all instances involving offenders defined in *Gray* and *Taylor* that "consecutive sentences should not routinely be imposed ... and that the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." *Id.* The 1989 Act is the codification of the holding in *Gray* and *Taylor.* Tenn.Code Ann. § 40–35–115(b). The guidelines, therefore, apply to both those offenses committed by the defendant before November 1, 1989, and those afterward.

Pertinent portions of the Sentencing Commission Comments are as follows:

> [C]onsecutive sentences should not routinely be imposed in criminal cases and the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

While this section permits consecutive sentencing, the trial judge has other available options, such as increasing the length of the sentence within the appropriate range depending on the presence of enhancement factors.

It has been held that multiple offenses may more appropriately involve concurrent sentences if the crimes are related. *State v. Holt,* 691 S.W.2d 520, 522 (Tenn.1984). Multiple offenses committed serially against a single victim have been held not to warrant consecutive sentences:

> [H]ow many of these separate offenses must be committed before their number alone is sufficient to constitute "the presence of aggravating circumstances," as indicated in the *Gray* opinion ...?
>
> [T]he demarcation may not be a "bright line" at all—that is, it may have to be drawn on an ad hoc basis, at a different point in each individual case, based on the totality of the circumstances.

*State v. Massey,* 757 S.W.2d 350, 353 (Tenn. Crim.App.1988).

This court has held that qualification as a dangerous offender, standing alone, may not support consecutive sentencing unless the record establishes other criteria: (a) the circumstances surrounding the commission of the offense are aggravated; (b) confinement is necessary to protect society from the defendant's lifestyle; (c) the aggregate sentences, if consecutive, reasonably relate to the offenses committed. *State v. Woods,* 814 S.W.2d 378, 380 (Tenn.Crim.App.1991).

The trial court found that the defendant was not only a dangerous offender but a multiple offender. Even though the circumstances of the crimes associated with each of the five victims may not be as aggravated or as dangerous as the precedent upon which the state relies, the number of victims, the time span of the defendant's undetected criminal activity, the nature and scope of each break-in and assault, and the degree of the intrusion upon the various victims, warrant classification as a dangerous offender. *See State v. Davis,* 825 S.W.2d 109 (Tenn. Crim.App.1991).

The ultimate purpose of the consecutive sentence is to protect the public from the anti-societal propensities of the offender. To that extent, we uphold the action of the trial court. And, while the need for the imposition of consecutive sentences is apparent, the trial court in its consideration of the circumstances of each crime overstepped his discretionary authority. By use of the guidelines established in *Gray* and *Taylor,* the extent to which consecutive sentencing was utilized here is, in a word, excessive. This defendant is not deserving of leniency. He showed no compassion for his victims. Yet an effective sentence of almost five hundred years is simply not necessary to meet the statutory goals.

The legislative purposes of sentencing include the imposition of a term in relation to the seriousness of the offense, confinement when necessary to avoid deprecating the seriousness of the crime, the provision of an effective deterrent to others, and the restraint of those with a long history of criminal conduct. These guidelines call for long sentences in this instance. Yet a goal in sentencing is to eliminate disparity in terms ordered for similar crimes. An aim is to avoid such inequalities and to impose the least severe measure necessary.

In our application of the purposes, principles and considerations involved in sentencing and with a specific design to protect society from this particular defendant, we are compelled to *modify certain of the consecutive sentences to provide as follows:*

| Count | Sentence | Range |
|---|---|---|
| 1 through 5 | Burglary (15) consecutive to rape (20); all remaining rapes concurrent | 40% |
| 6 and 7 | Aggravated rape (Life) consecutive to burglary (15) | 40% |
| 8 and 10 | Burglary (15) consecutive to assault with intent to commit rape (10 years) | 40% |
| 11 through 26 | Burglary (15 years) consecutive to rape (30 years) and each consecutive to a separate rape (30 years); all remaining sentences are concurrent | 60% |
| 27 through 30 | Burglary (15 years) consecutive to rape (30 years); remaining offenses concurrent | 60% |

---

The convictions are affirmed. The judgments are modified, however, as provided. We calculate counts one, two, three, four, five, six, seven, eight, and ten, as an effective sentence of life plus 75 years at 40%; counts eleven through thirty have an additional, effective sentence of 120 years at 60%.

SCOTT, P.J., and BIRCH, J., concur.