# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 13, 2000 Session

## STATE OF TENNESSEE v. JOHN DAVID PALMER

**Direct Appeal from the Circuit Court for Gibson County**
**No. 15497     Dick Jerman, Jr., Judge**

---

**No. W1999-01310-CCA-R3-CD - Filed February 7, 2001**

---

Defendant, John David Palmer, was convicted of voluntary manslaughter and especially aggravated robbery following a jury trial in Gibson County Circuit Court. He was sentenced to serve three years for voluntary manslaughter and twenty years for especially aggravated robbery with the sentences to be served concurrent with each other. He does not appeal the voluntary manslaughter conviction or sentence. However, regarding the conviction for especially aggravated robbery, Defendant challenges the sufficiency of the evidence to support the conviction and argues that the trial court committed reversible error by not instructing the jury on the lesser-included offense of theft and unauthorized use of a vehicle, i.e., joyriding. After review, we reverse and remand for a new trial on the offense of especially aggravated robbery.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Circuit Court Reversed and Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID G. HAYES, J., joined.

Tom W. Crider, District Public Defender; Perianne Houghton, Assistant Public Defender, Trenton, Tennessee, for the appellant, John David Palmer.

Paul G. Summers, Attorney General & Reporter; Mark E. Davidson, Assistant Attorney General; Clayburn Peeples, District Attorney General; Larry Hardister, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I.  FACTS**

Brenda Walker testified that she was a good friend of the victim, Jerry Cotham--a fifty-seven (57) year-old trader of quarter horses and exotic animals.  Walker stated that, in January of 1998, she had spoken with Cotham on the Friday night of the weekend Cotham died.  She testified that Cotham told her he might be going out of town.  The following morning, Walker saw Cotham and Cotham stated that he was not sure if he was going on his trip.  Later, Walker spoke to Cotham by phone.  She did not speak with Cotham anymore.

Walker testified that, at some point during the day, Cotham's mother called and said she was unable to contact Cotham.   Walker tried to reach Cotham by phone but did not get an answer.  She went to Cotham's house between 6:00 and 6:30 p.m., and saw one of Cotham's trucks in the yard and the other parked in the driveway.  She rang the doorbell, but no one answered.  Walker saw Cotham's dog, Elder, jump on the couch and then run back toward the kitchen.  Walker noted that this was unusual behavior for the dog, who normally stayed on the couch and barked.  After ringing the doorbell a few more times with no answer, Walker left some food she had for Cotham at the door and went home.  She continued calling Cotham until 10:30 p.m., but Cotham never answered.

At approximately 7:30 the next morning, Walker went back to Cotham's house and found the food still sitting at the door.  She checked for Cotham in the barn.  Then, she went back to the house and noticed that Cotham's Ford truck looked like someone tried to leave in it, but had become stuck in the mud.  She decided to use her key to enter the house, but first she called the Sheriff's office and asked them to send someone to enter the house with her.  When Deputies Todd Carson and Johnny Tucker arrived at the house, the three entered Cotham's home.

Walker recalled entering the house and finding the couch and coffee table out of place and the dogs loose.  She asked the deputies to check the garage for Cotham's Mach I Mustang.  She explained that Cotham was very protective of the car and would not allow anyone to drive it.  She stated that when the officers told her the car was gone, she knew something was wrong.  As Walker and the deputies walked down the hallway, they saw blood stains in the carpet.  Upon entering a bedroom, Walker noticed that the closet door was open.  She found Cotham's dead body lying in the closet wrapped in a blanket and a bearskin rug.  On cross-examination, Walker testified that she was the Administratix of Cotham's estate.  She also told the jury that several items were left in Cotham's home, which she sold during an estate sale.

Deputy Todd Carson testified that he met Brenda Walker and Deputy Johnny Tucker at Cotham's home on January 18, 1998.  The three entered the house through the back door and conducted a quick scan of the house.  As they entered the living room, they noticed from the imprints in the carpet that someone had moved the coffee table and couch.  As they looked closer, they noticed some marks in the floor, which appeared to be blood, leading toward the bedroom. Deputy Tucker stopped to call an investigator, while Deputy Carson checked the bedrooms.  Carson

explained that, in the far right bedroom, he noticed a blanket lying in front of a broken closet door. The door looked as if someone pulled it off its hinges. When Carson opened the closet door, he saw blankets covering Cotham's body and Cotham's legs slightly stretched out. Carson asked Deputy Tucker to call an ambulance, although he strongly suspected that Cotham was dead. The deputies secured the crime scene and waited for the sheriff and the investigators to arrive.

Detective Don Curry testified that he went to the home of Jerry Cotham to investigate the death of Mr. Cotham. Upon arrival, Detective Curry took pictures of the crime scene. Curry also told the jury that Cotham's yellow Mach I Ford Mustang was missing from the garage. Detective Curry testified that Officer Tunning of the Milan Police Department discovered the car in the Defendant's possession at a laundromat in Milan, Tennessee.

Detective Curry further testified that he took two statements from the Defendant. Curry stated that in Defendant's first statement, Defendant told the police that he had not seen Cotham and that Cotham had allowed Defendant to borrow the Mustang. Defendant insisted that he was thinking of buying the car from Cotham, so Cotham allowed him to test drive the car. Defendant also admitted that two guns were in the car when he took it-- a .38 caliber pistol and a .25 caliber pistol. Defendant said that both the guns remained in the car until he returned to his hotel in Milan. Defendant said he took the .38 caliber gun upstairs to his room and the other gun remained in the car under the driver's seat.

Detective Curry told the jury that, after a search of the Defendant's room in Milan, he found the .38 caliber pistol under the mattress. Curry testified that he also questioned the Defendant about a $575.00 check that the Sheriff found in Defendant's hotel room. Defendant claimed that he watched Cotham write the check and then Cotham gave the check to the Defendant for work he had previously done for Cotham.

Detective Curry told the Defendant that it was obvious Defendant was lying. Then, Defendant started crying and gave the officers his second statement. Defendant stated that he went to Cotham's house around noon, because Cotham was going to allow the Defendant to borrow the Mustang. Defendant told Curry that he went inside the house where he and Cotham talked for about twenty (20) minutes. Cotham left the room and returned with a gun, which he pointed at the Defendant and demanded that the two have sex. Defendant stated he stood up and pretended to unzip his pants. Instead, Defendant hit Cotham in the face and took the gun away. Then, the Defendant said he took a few steps, turned his head and fired two shots at Cotham. Defendant could only recall shooting the gun twice. Defendant told Curry that he became scared and wanted to get out of the house.

Defendant further told Curry that he covered the body with a blanket and went to the garage to take the Mustang, but it would not start. Defendant pushed the Mustang out of the garage and attempted to use the Ford truck to jump-start the car, but he got the truck stuck in the front yard. Defendant pushed the Mustang farther back and finally got it to start. Defendant further told Curry that, while he was outside trying to start the Mustang, he kept seeing Cotham's body, which made him sick. Defendant went back inside the house, pulled Cotham's body down the hallway, put the

body in a back closet and covered it with a blanket. Then, Defendant covered the blood stains in the hallway with two pillows.

Defendant stated to Curry that after he got the Mustang started, he drove directly to his mother's house. Defendant picked up his clothes from Carrie Belle Manor and rented a room at the Ramada Inn in Milan. Later, Defendant went to his ex-girlfriend's house. Afterwards, Defendant picked up his girlfriend and a boy named Tim, and the three drove around. Defendant also admitted forging the $575.00 check. Defendant said he was going to use the money to get away, but later decided he had no where to go. Later, Curry discovered that Defendant forged two other checks, a $125 check to Carrie Belle Manor and a $100.57 check to Wal-Mart. Subsequently, Defendant admitted forging the two checks, but stated that he found the checkbook under a seat in the Mustang. Curry testified that the two checks predated Cotham's death.

Curry further testified that he could tell from the entrance wounds on Cotham's body that Cotham was shot three times. Detective Curry also testified that he personally took the .38 caliber pistol to the Tennessee Bureau of Investigations Crime Laboratory for a ballistics test, and retrieved the gun when the test was completed. The State also introduced into evidence, through Curry, three shell casings removed from the scene and the three bullets removed from the victim's body by the medical examiner. On cross-examination, Curry told the jury that Cotham still had jewelry on his body when the police found him.

Sergeant Raymond Tunning of the Milan Police Department testified that officers of his department were told to be on the lookout for a yellow Mustang. They were given the license plate number of the vehicle. Tunning observed the vehicle pull into a laundromat and park. Tunning and another officer of the police department detained Defendant at the laundromat until the sheriff and his investigators arrived. The other officer found a pistol under the driver's seat of the Mustang, which he left there, until it could be retrieved by the sheriff's investigators.

Steve Clark, a former investigator for the Gibson County Sheriff's Department, testified that he received a call concerning the crime scene at Cotham's house. Clark spoke with the Defendant about some forged checks written on Cotham's account. Clark said that the Defendant admitted forging the checks. However, Clark could not remember whether the checks predated Cotham's death. Also, Clark could not recall what Cotham was wearing or if Cotham had any jewelry on his body.

Dr. Wendy Gunther, the Assistant Medical Examiner for Shelby County, testified that she did an autopsy on the body of Jerry Cotham. Dr. Gunther concluded that Cotham had been shot three times and each shot would have been fatal. She stated that one bullet entered the back of Cotham's head. Another bullet entered Cotham's right side and crossed through his liver and stomach, finally lodging in the left side of Cotham's chest. The final bullet entered Cotham's back underneath his shoulder blade and traveled through his spleen and colon. Dr. Gunther said that she could not determine the order in which Defendant fired the bullets. Dr. Gunther further concluded that the bullets were fired from more than three (3) feet away.

Special Agent Robert Royce, a Forensic Scientist with the Tennessee Bureau of Investigations testified that the three bullets recovered from Cotham's body and the spent shell casings were fired from the .38 caliber gun found in Defendant's hotel room.

The Defendant testified that, on January 18, 1998, Jerry Cotham came to his apartment in Carrie Belle Manor. Cotham asked the Defendant to go with him to Houston, Missouri to purchase two ponies. Defendant agreed to help Cotham if Defendant's girlfriend did not come over with Defendant's children. Defendant admitted he needed the money, because he had not worked a regular job for some time. Defendant also admitted that he had worked for Cotham off and on for approximately ten or eleven years.

Later that day, Defendant went to Cotham's house. When Defendant arrived, the two sat in the living room and talked. Defendant stated that he told Cotham that he wanted to hurry and leave, so that the two could get back before Defendant's girlfriend and children came to Defendant's house. At some point, Cotham went into the kitchen to cook some food, while Defendant stayed in the living room playing with Cotham's dog. Shortly after that, Defendant heard Cotham call his name and Defendant turned around to see Cotham pointing a gun at him. Defendant testified that he asked Cotham, "What are you doing?" Cotham replied that he wanted the Defendant to take off his pants and sit back down on the couch. The two men exchanged words and the Defendant tried to leave, but Cotham threatened to shoot the Defendant and tell the police that Defendant tried to rob him. Defendant asserted that he was scared, so he sat on the couch. Then, Defendant stood up and pretended to take off his pants. Defendant further testified that he grabbed Cotham's wrist with one hand and hit Cotham in the face with the other hand. Cotham fell to the floor and Defendant picked up the gun, turned his head and shot twice. Defendant stated that he shot the gun because he was afraid for his life. He also testified that he knew he should have just picked up the gun and left, but he was afraid Cotham would come after him.

Defendant further testified that he tried to call the police, but the phone line was dead. Then, Defendant went directly outside to the Mustang, which he intended to take. Defendant explained that Cotham had offered him the car, and that Cotham told Defendant he would give Defendant a car if Defendant came to work for him. Defendant admitted that Cotham did not say what car or truck he would give to the Defendant.

Defendant pulled the Ford truck into the front yard and attempted to start the Mustang, but the Mustang would not start. Defendant pushed the Mustang over to the truck so that he could use jumper cables to start the Mustang. While Defendant was waiting for the Mustang battery to charge, he went back into the house to cover and hide Cotham's body. Defendant covered Cotham's body with two blankets, dragged Cotham's body to the back bedroom and pushed the body into the closet. As Defendant walked back down the hall, he saw a little trail of blood, which he covered with two pillows. Defendant moved the couch over to cover a huge spot of blood, the sight of which he claimed made him sick. Afterwards, Defendant tried to call the police again, but the phone still was not working. Defendant saw Cotham's checkbook lying on the kitchen table and took it.

After Defendant left Cotham's house, he went to his mother's house to tell her what happened, but was too scared because other people were present. Defendant got a drink of water, kissed his mother and left. Defendant went to his apartment in Carrie Belle Manor and got his clothes. Then he went to his ex-girlfriend Kelly's house to tell her what happened, but he was unable to tell her. Defendant decided to leave town, but when he was halfway to Milan he decided he was not going to run from Cotham or leave his mother and sons. Defendant rented a room in Milan.

At this point, Defendant said he needed someone to talk with so he went to Alamo to visit his friend Christy Baker. Afterwards, he returned to his hotel room in Milan. The next morning he went to the laundromat to wash his clothes. Defendant claimed he wanted to have some clean clothes on when he turned himself over to the police Sunday morning. Defendant also testified that he was not trying to hide the car or steal the car and that is why he parked the car in front of the laundromat.

The Defendant also told the jury that Cotham had previously threatened him with a billy club and Cotham also tried to break up Defendant's previous marriage. Defendant told the jury about his prior employment situation with Cotham. Defendant stated that once Cotham left him stranded in Plant City, Florida with only $60.00 to make it back home to Jackson, Tennessee. Defendant also admitted to forging the three checks and to shooting Cotham twice, but asserted he did not remember firing a third shot. Yet, Defendant agreed that, if Cotham were shot three times, he must have shot Cotham three times.

At the close of all the proof, the jury returned a verdict convicting Defendant of voluntary manslaughter and especially aggravated robbery.

## II. SUFFICIENCY OF THE EVIDENCE

In two separate issues, Defendant essentially contests the sufficiency of the evidence to support his conviction for especially aggravated robbery.

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App.1995). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Especially aggravated robbery is defined in Tennessee Code Annotated section 39-13-403 as "robbery as defined in Section 39-13-401: (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury."

Robbery is defined in Tennessee Code Annotated section 39-13-401 as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tennessee Code Annotated section 39-14-103 provides that "(a) person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."

From the review of the evidence as discussed above, it is clear that the State had overwhelming proof that the Defendant shot and killed the victim with a deadly weapon. In addition, there is more than ample proof that the Defendant committed theft of the Mustang automobile. The question for further analysis is whether there is sufficient proof that the theft was "from the person" of the victim. As recently emphasized by our supreme court in State v. Owens, 20 S.W.3d 634, 641 (Tenn. 2000), "[i]ndeed, robbery is committed in Tennessee only if the 'theft of property *from the person* of another' is accomplished 'by violence or putting the person in fear.'" Tenn. Code Ann. § 39-13-401(1997). Id. at 641 (emphasis in original).

The proof in this case was that the Defendant shot and killed the victim inside the victim's home, and immediately went into the garage and began his efforts to take the Mach I Mustang. There is evidence in the record that the garage was attached to the residence. In fact, in Defendant's first statement to Investigator Curry, Defendant stated that on the date of the incident, he knocked on the Defendant's door and the victim did not answer. After checking around the barn, the Defendant stated that he opened up the garage door, went inside and opened up the door that leads from the garage to the rest of the house and yelled again for the victim three times. The theft of property located in essentially the same building as the victim is located, is sufficient to be "from the person" of the victim. See James v. State, 214 Tenn. 683, 383 S.W.2d 20 (1964); Morgan v. State, 220 Tenn. 247, 415 S.W.2d 879 (1967); State v. Edwards, 868 S.W.2d 682, 699-700 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1993). There is sufficient evidence for a rational trier of fact, considering the evidence in the light most favorable to the State, to find that the intentional or knowing theft of the Mach I Mustang, from the person of the victim, was accomplished by violence wherein a deadly weapon was used and the victim obviously suffered serious bodily injury.

The Defendant further asserts that the jury verdicts were impermissibly inconsistent. The Defendant argues that the jury's inability to find the underlying felony necessary for a felony murder conviction, preponderates against a finding of guilty as to especially aggravated robbery. We disagree. Our supreme court has long held it unnecessary to require consistency in verdicts when there are multiple count indictments, because each count is a separate indictment. Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973). In Wiggins, the Tennessee Supreme Court adopted the reasoning of Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L. Ed. 356 (1932), and held that "a seemingly inconsistent verdict" would not be reversed due to speculation as to the jury's reasoning.

Id. at 94. If an appellate court is "satisfied that the evidence establishes guilt of the offense upon which the conviction was returned," the court must uphold the conviction. Id.

### III. LESSER-INCLUDED OFFENSE CHARGE

The Defendant contends that the trial court erred when it failed to instruct the jury on the lesser-included offenses of especially aggravated robbery, i.e., theft and "joyriding."

In its brief, the State concedes that the trial court committed reversible error by not charging the jury on theft as a lesser-included offense of especially aggravated robbery. We agree. There is no question that theft is a lesser-included offense of especially aggravated robbery. Indeed, especially aggravated robbery cannot occur unless there is proof of a theft. Therefore, it is a lesser-included offense under part (a) of the test set forth by our supreme court in State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999). In addition, evidence does exist that reasonable minds could accept as to the lesser-included offense of theft and that the evidence is legally sufficient to support a conviction for the lesser-included offense of theft.

The error by the trial court of not charging theft is not harmless error in this case. This is true whether the standard is "harmless beyond a reasonable doubt" or under the lesser standard that the error "more probably than not affected the judgment to the defendant's prejudice." See State v. Swindle, 30 S.W.3d 289, 293 (Tenn. 2000); State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998)

Regarding the Defendant's assertion that the trial court erred in failing to charge "joyriding," i.e. unauthorized use of a vehicle as prohibited in Tennessee Code Annotated section 39-14-106, we note that this court has previously held that "joyriding" is a lesser-included offense of theft of a vehicle under part (b) of Burns. See State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999). In State v. Brooks, 909 S.W.2d 854, 860 (Tenn. Crim. App. 1995), filed prior to Burns, our court held that the unauthorized use of a vehicle, "joyriding," was a lesser-included offense of theft of a vehicle. Later, in State v. David Michael Gamble, No. 03C01-9812-CR-00442 (Tenn. Crim. App. filed January 1, 2000 at Knoxville), another panel of this court also held that "joyriding" is still a lesser-included offense of theft of a vehicle under part (b) of the test set forth in Burns.

Following the mandates of Burns, we next examine whether, in this case, the trial court erred by not charging the lesser-included offense of joyriding in this case. Taken in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of the evidence, we note that Defendant testified that he intended to turn himself in to the police prior to his arrest, and that he was not trying to hide or steal the car at the time he was arrested, as evidenced by the fact that he parked it in front of the laundromat in Milan. We hold that a jury could accept this evidence, along with other evidence in the case, that Defendant did not have the intent to deprive the owner of the vehicle. Therefore, the trial court erred by not charging joyriding. Again, examining the case under State v. Williams, supra, we find that whether the error must be viewed as harmless beyond a reasonable doubt, or under the lesser burden that it more probably than not affected the judgment, the error was not harmless.

## IV. CONCLUSION

Due to the fact that the trial court committed reversible error by not charging the lesser-included offenses of theft and "joyriding," we reverse the conviction for especially aggravated robbery and remand this case for a new trial. In addition, the judgment of conviction for voluntary manslaughter is affirmed.

THOMAS T. WOODALL, JUDGE