IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2017 Session

**STATE OF TENNESSEE v. KARLOSS THIRKILL and RICO HUEY**

**Appeal from the Criminal Court for Shelby County**
**No. 12-03675        Glenn Ivy Wright, Judge**

——————————————————————

**No. W2016-00335-CCA-R3-CD**

——————————————————————

After a jury trial, the defendants, Karloss Thirkill and Rico Huey, were convicted of aggravated robbery, and this joint appeal followed. On appeal, Huey challenges the trial court's partial denial of his motion to suppress. Thirkill challenges the trial court's denial of his request to impeach a fact witness and accomplice under Rules 404 and 608 of the Tennessee Rules of Evidence and the sufficiency of the evidence to sustain his conviction. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Eric Mogy, Memphis, Tennessee, for the appellant, Karloss Thirkill.

Varonica Cooper, Memphis, Tennessee, for the appellant, Rico Huey.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Amy Weirich, District Attorney General; and Muriel Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

This case arises as the result of an aggravated robbery occurring December 9, 2011, in a motel room where David Rodriguez, the victim, was robbed by the defendants, who forcibly entered the room with guns and attacked him. Without the victim's consent,

the defendants took his pants, wallet, bank cards, cash, truck, and work tools. The victim reported the incident to the Memphis Police Department ("MPD"), and a Shelby County grand jury subsequently indicted both defendants for aggravated robbery.

## A. Motion to Suppress

Huey filed a motion to suppress the victim's photographic identification of him following lineups conducted on December 17, 2011 and February 12, 2012. The State initially consented, believing Huey requested only the suppression of the tentative identification made during December 17, 2011 lineup. After learning Huey wished to suppress the identification made February 12, 2012 as well, the State withdrew its consent. When doing so, counsel for the State commented, "I don't think we're going to have a meeting of the minds on it." The trial court subsequently held a full evidentiary hearing on the motion, during which the victim, Detective Fausto Frias, and Maria Lucchesi testified. The trial court subsequently suppressed the identification made December 17, 2011 but allowed the introduction into evidence of the identification made February 12, 2012.

In its order partially granting the motion to suppress, the trial court made the following findings of fact:

> The victim in this case, David Rodriguez ('[v]ictim'), testified that he received a phone call from his friend Jessica (later identified as Jo Elizabeth Randle) on December 9, 2011, asking for his help in securing a place to stay for the night. He picked her up and obtained a room for her at the Airways Inn Motel. After he and [Ms. Randle] checked in, the [v]ictim entered the bathroom in the motel room. During this time [Ms. Randle] unlocked the motel room door. Upon re-entering the main portion of the motel room, the door was kicked in by two African American males, one appearing short and hefty and the other a taller, slimmer man. Each held a gun. At the hearing, the [v]ictim stated that he did not give police officers an exact height of the perpetrators. Instead, he told them where the men measured on the door they kicked in, and the officers used that to formulate a height measurement that was used in the police report.

> The [v]ictim then stated that [Ms. Randle] left the motel room, and the males then assaulted and robbed the [v]ictim at gunpoint. The [v]ictim testified that he was only able to observe the perpetrators for approximately 30 seconds before being forced face down on the floor. He said he saw the perpetrators' faces but then focused on the guns they were pointing at him; therefore, he mainly focused on their eye area. The shorter, heavier man

- 2 -

grabbed the [v]ictim by the neck and forcibly put him on the ground. The [v]ictim then had an opportunity to study the clothing the men were wearing and was later able to describe those items in detail.

Fearing for his life, the [v]ictim said that he grabbed the shorter one in the genital area, causing the taller man to hit the [v]ictim in the head and stomach with his gun. The shorter one then attempted to remove the [v]ictim's pants, apparently to make it difficult for him to follow them, and the two males then took the [v]ictim's wallet, cell phone, and car keys. At that point, they left the motel room and took the [v]ictim's 2000 Dodge Silverado truck. The [v]ictim said he called 9-1-1 immediately after the two males left and gave a description of the perpetrators. That description was mainly of the relative height of the two men and what clothing they were wearing. The only facial description the [v]ictim gave was that the two were clean-shaven, and one of the men had a short dread hairstyle. Police arrived on the scene, and they took another description of the events and the perpetrators from the [v]ictim.

Detective Fausto Frias, a native-Spanish speaker, interviewed the [v]ictim [and] presented him with . . . photospreads on two occasions: December 17, 2011 and February 12, 2012. Because the [v]ictim is not a native English speaker and is more comfortable reading, writing, and speaking in Spanish, Detective Frias conducted both interviews with the [v]ictim primarily in Spanish and presented him with Spanish-language Advice of Rights forms, which the [v]ictim completed both times.

At the December 17 interview, the [v]ictim gave an official statement. In that statement, the [v]ictim described the two men who robbed him. The first perpetrator was African-American and wore a black hooded sweatshirt with grey writing on it, grey pants, and black boots. According to the official statement, the [v]ictim told police that this man was shorter than him, appeared young and chubby with a dark complexion, and carried a black gun. The [v]ictim described the other perpetrator as also African-American, with a short dread hairstyle, and a lighter complexion than the other perpetrator. This man also wore a black shirt with a black jacket and black pants. He had a silver handgun with a black handle, which he used to hit the [v]ictim in the face. The [v]ictim said the second man was stockier than the other and appeared approximately 27 years old. Further, the [v]ictim said that this perpetrator was taller than him and, according to the statement, the [v]ictim claimed his own height to be 5 feet 8 inches.

Detective Frias then presented three photospreads to the [v]ictim. Two were of white females, attempting to identify [Ms. Randle]; the other was a photospread of black males. On this photospread the [v]ictim circled picture number four (4) and wrote below the image, "this looks like the guy who assaulted me" in Spanish. This image was of [d]efendant Rico Huey. The [v]ictim was not certain, however, as to this identification, and no positive ID was made on December 17.

On February 12, three photospreads were presented to the [v]ictim by Detective Frias: one for a white female and two for black males. This time, however, the [v]ictim made positive identifications in all three. Detective Frias once again showed the [v]ictim a photospread containing an image of Huey; none of the other individuals from the December 17 photospread were re-used, with or without a new photo. Despite the fact that the [v]ictim stated the taller man had dreads, none of the images used in the photospread showed a man with dreads. Further, the photo of Huey in the February photospread was different; it had better lighting making Huey's face more discernible. Further, Huey's face appeared to be looking in a different direction from the earlier image, and the overall coloring of the image was improved. The [v]ictim, upon presentation of the photospread labeled "F," once again circled Huey's image, this time in the number (2) slot. Beneath the image he wrote, "[T]his individual kicked me. This is the individual that kicked the door and hit me, robbed me of my truck, took my wallet, with his gun and struck me."

The [v]ictim also positively identified Thirkill in the number (5) slot on the photospread labeled "E." Under this image he made the following comments: "[T]his person was the one that pointed the gun – the weapon. He robbed me. He hit me. He hit me in my head and took my truck."

When questioned at the hearing, the [v]ictim stated that his memory is more clear now than it was at the time of the incident because he was in shock when he gave his initial statements to police immediately after the robbery and assault and on December 17. As time went by he was under less stress and therefore better able to not only recall the events, but to identify the perpetrators.

The trial court noted both defendants filed motions to suppress the victim's photo identifications of them and concluded Thirkill's due process rights were not violated by the procedures used in the second lineup. The trial court concluded the December 17,

2011, lineup violated Huey's rights, but the procedures used February 12, 2012, did not. When reaching this conclusion, the trial court noted it could not conclude whether the photospreads were unduly suggestive because neither defendant asserted they were suggestive. The trial court then went on to consider whether, after looking at the totality of the circumstances, the identifications were reliable. Based on the five factors set out in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), the trial court suppressed the identification of Huey made on December 17, 2011, because "[t]he December 17 identification lacks certainty; it is not considered a positive identification by the Memphis Police Department, even though it occurred far closer in time to the robbery than the February 12 identifications." The trial court did not suppress the identifications made on February 12, 2012, concluding:

> The February 12 identifications, however, are "positive" identifications. The [v]ictim testified at the hearing that he was able to remember clearly certain details about the perpetrators in February, such as their complexions, hairstyles, whether they were clean shaven, and their clothing, because he was no longer under the stress and shock of the robbery and assault. Further, the [v]ictim also had ample opportunity to view both perpetrators while they held him at gunpoint; he reiterated at the hearing that he kept staring at the guns and the perpetrators during the robbery. Despite a period of two months passing between the robbery and this identification, the [v]ictim was able to make a positive identification.

> Though Huey argues that the [v]ictim was merely identifying the same person from the previous photospread, the images used of Huey in the two photospreads were completely different. On February 12, the [v]ictim still identified [d]efendant Huey without hesitation, and this time with certainty. At the hearing on this motion, the [v]ictim testified that on December 17, he was still in shock from the robbery and unable to process the events clearly. By February 12, the shock had [worn] off, and he was able to make the positive identifications of all three: Jo Elizabeth Randle, Rico Huey, and Karloss Thirkill.

The trial court further ruled the victim was not precluded from making an in-court identification of Huey. Within his motion to suppress, Huey also included a motion to dismiss. The trial court denied the motion.

## B.    Trial

The trial of this matter went forward on October 12, 2015. At that time, the parties presented the following evidence: The victim testified that he received a

telephone call from Ms. Randle on December 9, 2011, asking him to meet her at a restaurant in Memphis, Tennessee. According to the victim, he met Ms. Randle approximately a week and a half earlier at a construction site where he was working, and she told him her name was Jessica. Later, Ms. Randle told him she also went by the name Stephanie. The victim met Ms. Randle as requested and agreed to take her to a nearby motel. The victim testified at trial that Ms. Randle asked him to rent a motel room for her because she did not have a place to stay for the night. When they arrived, the victim paid for the room in the motel office and obtained a key while Ms. Randle waited outside next to the car. Ms. Randle and the victim then walked into the motel room together and locked the door behind them.

Once inside the motel room, Ms. Randle attempted to use the phone in the room, but it was not working. Ms. Randle then received a call on the victim's cell phone from a number later identified as belonging to Huey, and Ms. Randle gave the caller her motel room number. The victim testified that Ms. Randle asked him to stay for a while because she was scared. Ms. Randle then instructed the victim to take a shower because he had been working at the construction site all day. The victim declined and went inside the bathroom to use the toilet instead.

When the victim exited the bathroom, he noticed the motel room door was ajar. According to the victim, he walked across the room and tried to shut the door as the defendants, both of whom the victim identified in the courtroom, kicked it open. Both men entered the room, pointed guns at him, and instructed him to lie on the ground. Huey then grabbed the victim by the neck, choked him, and dragged him to the floor. In response, the victim grabbed Huey's genitals, and Huey released him. Thirkill then hit the victim in the head with his gun, and both defendants began kicking him. Huey grabbed the victim's neck again, while Thirkill took off the victim's pants. The defendants then told the victim to stay where he was, otherwise they would kill him. Next, the defendants took his pants, which contained his wallet, car keys, and cell phone, and left in his truck with Ms. Randle. After they left, the victim pulled up a second pair of pants he had been wearing under his construction pants for warmth and called "911." He reported the incident to the police and, despite being bruised and in pain, declined medical treatment.

At trial, the victim testified he was in the room with Ms. Randle for approximately five to seven minutes before the defendants arrived. The victim conceded that once defendants arrived and the attack began, he went into a state of shock and only saw their faces for a "few seconds." The defendants had guns in front of their faces, so during the attack, the victim focused on the guns and the surrounding eye and facial areas.

Without the victim's consent, the defendants took his bank card, cell phone, truck, work tools inside his truck, and cash inside his wallet. The truck was worth approximately $6000, and the tools were worth approximately $1500. Calls were subsequently made from the victim's cell phone, and his bank card was used at a gas station. The police eventually returned the victim's truck to him, but there were missing parts.

Ms. Randle offered a slightly different version of events at trial. According to Ms. Randle, she was sixteen years old at the time she met the victim. She ran away from her family in Mississippi and had been living in Memphis for about two months. She did not have a permanent residence but lived with Huey on occasion. About a day and a half before the incident, Ms. Randle and Huey were at a house close to a construction site where the victim was working. She and Huey saw the victim, and Huey instructed her to approach and get his cell phone number. She followed Huey's instructions and, at Huey's request, called the victim on December 9, 2011 and offered to have sex with him in exchange for $60. Ms. Randle asked the victim to pick her up at a restaurant so the two of them could go to a nearby motel together. Once at the motel, the plan was for Ms. Randle to take the victim's money and leave without having sex with him.

Ms. Randle, Huey, Thirkill, and Ms. Maria Lucchesi, Huey's girlfriend, met at the restaurant in advance to finalize their plan. Huey, Thirkill, and Ms. Lucchesi waited in a vehicle parked outside. Once the victim arrived at the restaurant, Huey, Thirkill, and Ms. Lucchesi followed in a car and waited in a nearby parking lot. The victim then went into the motel office to pay while Ms. Randle waited outside by his truck. The two of them went into the room together, and Ms. Randle asked the victim to take a shower. The victim complied, and while he was in the shower, Ms. Randle took the money from the victim's wallet and ran out of the room. The victim had a total of $60 in his wallet, the same amount he agreed to pay her for sex. Ms. Randle then went back to the car where Ms. Lucchesi, Huey, and Thirkill were waiting and told them she had the money.

Huey and Thirkill told Randle to go back inside the room and wave the curtain if the victim was still in the shower. The victim was getting out of the shower and in the process of putting his clothes back on when Ms. Randle returned, so she sat on the end of the bed with the door ajar. Huey and Thirkill then ran into the room. Thirkill had a gun and hit the victim with it. The victim fell to the ground and both defendants began kicking him.

The phone in the motel room rang, and Ms. Randle answered it. The person on the other end asked if everything was okay, and Ms. Randle said they were just having fun and would be quieter. According to Ms. Randle, when she got off the phone,

"[Thirkill] had asked [Huey] if he wanted him to go ahead and do that."  Huey said yes, and Thirkill ran out of the room.  Ms. Randle did not know what they were taking about.

After Thirkill left, Huey went into the bathroom and searched the victim's pants.  Huey and Ms. Randle then left together a few minutes later.  The victim was limping, hurt, and naked at the time.  Huey and Ms. Randle did not see Thirkill outside the motel room, so they ran across the street, where Ms. Lucchesi was waiting with the car.  Ms. Randle never saw the victim's car again and did not know how Thirkill left the hotel.

Ms. Randle confirmed she was arrested for her involvement in the robbery, and the charges were still pending.  While she was incarcerated, Huey sent her a letter that stated, in part:

> Don't be down there thinking everybody straight, you'll end up getting us f***ed off talking to them snake assed b****es.  I want you to know I think about you a lot and hate I couldn't help you like I really wanted to.  I hope you understand that I never meant to let so many people down.  That it hurts Rico, Boo-boo, Maria, you, and the list goes on, but God knows my heart and hopefully you do, too.

> . . .

> Don't sweat our case, keep it together.

Ms. Randle acknowledged multiple inconsistencies in the statement she had previously given to the Memphis Police Department ("MPD") and her trial testimony.  For example, Ms. Randle previously told the MPD that Thirkill planned the robbery, but at trial she stated Huey planned it.  She told the MPD she left the door unlocked when she returned to the room but failed to mention she also left it cracked.  At trial and in her statement, Ms. Randle stated there was only one gun present.  However, she told the MPD Huey held the gun, while at trial she testified Thirkill held it.  Lastly, in her statement to the police, Ms. Randle said she was to wave the curtain if the victim was out of the shower when she returned, but at trial she testified she was to wave it if he was still in the shower.  Ms. Randle explained she had previously been incorrect but was being honest at trial.

According to the victim, on December 12, 2011,[1] he spoke with Fausto Frias, a detective with the MPD, regarding the incident.  Detective Frias and the victim primarily

---

[1] Despite the trial court's suppression of the identification of Huey made December 11, 2011, the trial court allowed it in as Exhibit 5 after being requested by Huey's attorney to make it an exhibit at trial.

communicated in Spanish because that is his first language. When describing the African American men that entered the motel room to the detective, the victim said one was short, chubby, and wearing a hooded sweatshirt. The other man was taller, muscular, had braids, and had a lighter complexion than the shorter man. Both men were holding guns that partially covered their faces. Another officer subsequently created a photographic lineup of potential suspects, and the victim viewed it on December 17, 2011, at which time he marked a photograph of Huey. Under the photograph, the victim wrote in Spanish, "This looks like the man who assaulted me." The MPD did not consider this a positive identification because the victim was not 100% certain the man marked was his assailant.

In February 2012, detectives with the MPD received new information regarding the case and were able to identify additional suspects. Detective Frias showed the victim three additional lineups on February 12, 2012, one with Caucasian women and two with African American men. From those lineups, the victim selected Ms. Randle, Huey, and Thirkill. The lineup containing Huey used a different photograph than the one used in the December lineup. The new photograph was taken in better lighting and had a clearer view of his face. Huey was the only individual featured in both the December and February lineups.

Detective Frias wrote a supplemental report to the file after the positive identifications. In the report, he included the name, "Roy Huey," as a suspect. Detective Frias testified that this was a typographical error. Instead, he meant to write the name "Rico Huey."

After calling the victim, Detective Frias, and Ms. Randle to testify, the State rested. Huey then called Ms. Lucchesi, Dr. Jeffrey Neuschatz, and Paula Randle, Huey's mother, to testify. Ms. Lucchesi testified that she was in a romantic relationship with Huey in December 2011. Ms. Lucchesi knew Huey's family members, including his brother, Roy Huey. She also knew Ms. Randle. In a letter Ms. Lucchesi sent to Ms. Randle during her incarceration, Ms. Lucchesi stated, in part, "You have to listen to me and do exactly what I say when it comes to this court sh** so you can get out and he can get out. Please, because any f*** ups will f*** you up." Ms. Lucchesi was referring to Huey in the letter and never mentioned Thirkill.

Dr. Neuschatz, a psychology professor at the University of Alabama, testified next as an expert in eyewitness identification. According to Dr. Neuschatz, a witness's memory of an event is greater if exposed to the event for a long period of time. Conversely, if a witness is only exposed to an event for a short period of time, that witness's memory is likely to be worse. Stressful situations and the presence of a weapon both have a negative impact on memory. In the presence of a weapon, most people focus

on the weapon instead of the person holding it. A covered hairline created by a hat or the hood of a sweatshirt also has a negative impact on memory because the witness views fewer facial features. Cross-racial identification can be difficult, particularly between Caucasians and African Americans. Both groups tend to interact with individuals of the same race more often in their daily lives, so they are more likely to remember identifying facial characteristics they have seen repeatedly. Studies show that for this reason, Caucasians have difficulty positively identifying African Americans. Dr. Neuschatz had not studied the impact of this theory on Latinos identifying African Americans but suspected the same theory would not apply.

Dr. Neuschatz further testified regarding the best police practices to be used by the police when creating a lineup. Dr. Neuschatz stated the officer creating the lineup should not know the suspect's identity and should communicate this to the witness prior to showing the witness the lineup. The officer should also instruct the witness that the person who committed the crime may or may not be in the lineup. All the fillers used in the lineup should meet the description provided by the witness. Further, a confidence statement is needed, meaning that after the witness views the lineup, he or she is asked this question: "How confident are you that you picked the right person?" The MPD used some of these practices in this case but not all. Detective Frias read the proper instructions prior to both lineups, but at least the second time, he knew the suspects were part of the lineups. Detective Frias also did not take confidence statements following the lineups. In addition, Huey was present in two lineups, making the victim more likely to select him the second time. Officers should only include potential suspects in one lineup.

Paula Randle[2] testified as Huey's final witness. Paula identified herself as Huey's mother. Paula had five sons, including Huey and Roy Huey. She stated that Huey is her eldest son, and Roy Huey is one of Huey's his younger brothers.

After Huey rested, Thirkill rested without presenting proof. The jury subsequently found both defendants guilty of aggravated robbery of property valued at $2000. Following a sentencing hearing, the trial court sentenced Thirkill to eleven years in confinement and Huey to nine years in confinement.

Both defendants filed timely motions for a new trial. The trial court denied the motions. These timely appeals followed.

---

[2] So as not to confuse her with Jo Randle, we have identified Paula Randle by her first name. We mean no disrespect when doing so.

*Analysis*

On appeal, Huey asserts the trial court erred when failing to honor the consent agreement suppressing the photographic lineups of Huey and, instead, partially denying his motion to suppress. Thirkill argues the trial court erred when refusing to allow testimony under Rules 404(b) and 608 of the Tennessee Rules of Evidence regarding other robberies committed by Ms. Randle. In addition, Thirkill challenges the sufficiency of the evidence. The State contends the trial court properly held an evidentiary hearing on Huey's motion to dismiss, properly partially granted the motion to suppress, exercised proper discretion when excluding testimony regarding the other robberies Ms. Randle confessed involvement with, and the evidence was sufficient for a rational juror to find the defendants guilty of aggravated robbery. Following our review of the record, arguments of the records, and appropriate authorities, we agree with the State.

**I.      Motion to Suppress**

   A.      Consent Agreement

Huey first asserts the trial court erred when holding an evidentiary hearing on his motion to suppress rather than honoring the consent agreement reached between the parties. At the outset, we note the record does not contain the consent order Huey alleges the trial court should have enforced, nor does it appear the trial court ever entered a consent order granting the motion to suppress. Rather, over the course of multiple court dates, the parties discussed the State's consent to the pending motion to suppress, and the trial court requested the entry of a written consent order. Prior to the entry of the requested order, the State withdrew its consent, announcing Huey wanted both the December 17 and February 12 lineups suppressed, which it had not agreed to, so the prosecutor stated, "I don't think we're going to have a meeting of the minds on it." The trial court subsequently held a full evidentiary hearing on the motion at a later date, ultimately suppressing the identification made December 17, 2011, but allowing the introduction of the identification made February 12, 2012. When doing so, the trial court entered a written order finding: "The December 17 identification lacks certainty; it is not considered a positive identification by the Memphis Police Department, even though it occurred far closer in time to the robbery than the February 12 identifications. The February 12 identifications, however, are 'positive' identifications."

A consent order has been defined as "'a solemn contract or judgment of the parties put on file with the sanction and permission of the court.'" *Bacardi v. Tennessee Bd. of Registration in Podiatry*, 124 S.W.3d 553, 562 (Tenn. Ct. App. 2003) (citing 49 C.J.S. *Judgments* § 182 (1997)). "[E]ven if a settlement agreement can be enforced through later entry of a consent order if the agreement had the consent of all parties at the time it

was approved by the court, the parties' prior oral agreement must have been made 'in open court' or in a 'hearing' wherein the fact and the terms of the agreement were determined." *Environmental Abatement, Inc.*, 27 S.W.3d 530, 536 (Tenn. Ct. App. 2000). Contracts, whether written or oral, simply cannot be enforced in the absence of a meeting of the minds of the parties as to all terms. *Higgins v. Oil, Chem. and Atomic Workers Int'l Union*, 811 S.W.2d 875, 879 (Tenn. 1991).

While there are circumstances where a court can enforce a consent agreement announced in open court despite the absence of a written order documenting the agreement, those circumstances are not present here. Based on our review of the record, when the parties returned to court on June 30, 2014 to enter the consent order, the State announced it could not consent to the suppression of both identifications and instead wanted to litigate the matter. The parties never agreed on all terms of the agreement Huey contends they reached, so there is no agreement to enforce. The trial court did not err when proceeding with an evidentiary hearing on Huey's motion to suppress. Huey is not entitled to relief on this issue.

### B.     Order Partially Granting Motion to Suppress

Huey next argues the trial court erred when only partially granting his motion to suppress because the procedure used February 12, 2012, was suggestive and unreliable. The State contends the identification procedure utilized was not unnecessarily suggestive and, even if it was, the identification was reliable because the victim confidently identified Huey soon after the robbery, and the identification was made after the victim had an ample opportunity to observe Huey. We agree with the State.

Appellate courts are bound by a trial court's findings of facts determined after a suppression hearing unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. Appellate courts afford the prevailing party the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, applying the law to the factual findings of the trial court is a question of law, which is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). When reviewing the trial court's ruling on a motion to suppress, appellate courts may consider the evidence presented at both the suppression hearing and the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

Pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution, the pretrial identification of a defendant by photograph will only be

suppressed if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary," and only if the eyewitness's identification "is tainted by police arrangement." *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012). Suppression of the photographic identification is not always necessary even if the police do use a suggestive and unnecessary procedure. *Id*. at 239. Instead, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conductive to irreparable mistaken identification that [the accused] was denied due process of law.'" *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)).

In *Biggers*, the United States Supreme Court set forth the test for determining whether the pretrial identification of a defendant is admissible as evidence at trial. First, this two-part analysis requires the trial court to determine whether the identification procedure was unduly suggestive. *Biggers*, 409 U.S. at 198. The identification cannot be "conducted in such an impermissibly suggestive manner to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998). If the court finds the identification procedure was unduly suggestive, then the second question is whether the identification was reliable despite this undue suggestion. *Biggers*, 409 U.S. at 198-99. When making this determination, courts are to consider the following:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200. The corrupting effect of the suggestive procedure is weighed against these factors. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). If, after considering these factors, the court concludes the identification was so unduly suggestive that it violated the defendant's due process rights, then the court must exclude the photographic lineup from evidence. *State v. Shanklin*, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980). The court, however, need not apply these factors if it does not first conclude law enforcement used an unnecessarily or impermissibly suggestive procedure or that the identification procedure used created a substantial likelihood of irreparable misidentification. *Biggers*, 211 S.W.3d at 749.

- 13 -

This Court has previously considered whether it is suggestive to have multiple lineups of the same suspect and reached different conclusions. In *State v. Edwards*, 868 S.W.2d 682 (Tenn. Crim. App. 1993) *perm. app. denied* (Tenn. Aug. 2, 1003), this Court considered whether the identification testimony of a victim and a witness for the State were admissible where both were only able to make positive identifications after viewing two photographic lineups and a physical lineup. *Edwards*, 868 S.W.2d at 694. The first lineup contained an eight-year-old photograph of Edwards, and neither witness was able to make an identification. *Id*. The second lineup contained a more recent photograph of Edwards in which his physical appearance had changed, but otherwise completely different individuals, and the State's witness was able to make a tentative identification. *Id*. Law enforcement then created a physical lineup containing Edwards, and both witnesses positively identified Edwards. *Id*.

This Court held the identification procedure used in *Edwards* was "somewhat suggestive." *Id*. at 695. When reaching this conclusion, we relied on the holding of the Supreme Court of Minnesota in *State v. Witt*, 245 N.W.2d 612 (Minn. 1976), stating:

> If suspicion has focused on a particular individual and his picture is shown to the complainant along with others but the complainant does not identify the picture, a subsequent lineup, even though otherwise proper, is open to question when that individual is the only person in the lineup whose picture has recently been shown to the complainant. It would be a better practice in such a situation to eliminate the use of photos and proceed directly to the lineup, or to include in the group of pictures shown at least one or more pictures of persons other than the suspect who also subsequently appear in the lineup.

*Id*. at 615.

Our analysis did not end with our conclusion law enforcement used a suggestive lineup procedure. We next applied the *Biggers* factors to determine whether, despite the suggestive nature of the lineup, the identifications were reliable. *Edwards*, 868 S.W.2d at 695. Weighing in favor of admissibility, neither witness casually observed Edwards. *Id*. The victim had at least forty-five minutes to view her assailant, and the other witness viewed Edwards on several occasions. *Id*. The victim accurately described Edwards to law enforcement. *Id*. Moreover, despite hesitancy when viewing the photographic lineups, both witnesses positively identified Edwards when viewing the physical lineup. *Id*. The victim told officers she identified her assailant "beyond a shadow of a doubt," and the other witness found Edwards to be "easy to identify." *Id*. Lastly, only a month and a half lapsed between the victim's identification of Edwards, and less than a month lapsed between the other witness's final observation of Edwards and the physical lineup.

- 14 -

*Id*. When weighing these timespans in favor of admissibility, we noted, "[i]n *Forbes* [*v. State*, 559 S.W.2d 318 (Tenn. 1977)], our Supreme Court held a span of 98 days to be within close proximity and thus favoring admissibility." *Id*. Based on this analysis, we concluded that "the identification of each witness was reliable, therefore admissible, and not in contravention of the defendant's right to due process." *Id*.

In *State v. Dequan Hasani Bertrand*, No. M2016-00920-CCA-R3-CD, 2017 WL 1828346 (Tenn. Crim. App. May 4, 2017) *applic. for perm. app.* (Tenn. June 30, 2017), we again considered whether a victim's positive identification of a defendant after viewing two separate lineups, both containing photographs of the defendant, was suggestive and concluded it was not. *Id*. at *15. During the incident giving rise to the allegations, the victim viewed Bertrand's face for five or six seconds as he crossed her living room. *Id*. at *2. Bertrand then walked behind the victim and told her not to look at him, and she complied. *Id*. Immediately after the robbery and assault, the victim's fiancé reported the incident to the police. *Id*.

Two officers were assigned to investigate robbery and sexual assault allegations made by the victim. *Id*. at *15. The day after the robbery, the officer assigned to investigate the sexual assault assembled a photographic lineup that included a photograph of Bertrand in which he was smiling and several men with similar appearances. *Id*. The victim was unable to make a positive identification. *Id*. Unaware the victim had already viewed a photographic lineup, the officer investigating the sexual abuse allegations assembled a second photographic lineup two days later. *Id*. This lineup contained a different picture of Bertrand, one in which he was not smiling, and photographs of several similar looking men. *Id*. Bertrand was the only individual depicted in both lineups. *Id*. The victim immediately identified Bertrand in the second lineup, later explaining she did not recognize him in the first lineup due to his smile. *Id*. Based on these facts, this Court concluded "these lineups were not conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *Id*.

This Court further found that based on the totality of the circumstances, the victim reliably identified Bertrand. *Id*. at *16. The victim observed him in the daylight for an estimated five seconds. *Id*. Her description of Bertrand was general but accurate. *Id*. Further, after viewing the second lineup, the victim identified Bertrand with 100% certainty. *Id*. Accordingly, we concluded the trial court did not err when denying Bertrand's motion to suppress the positive identification made during the second lineup. *Id*.

Here, Huey argues the February 12, 2012 lineup was suggestive because Huey was the only individual featured in the lineup that was also featured in the December 17, 2011

lineup. Citing the *Biggers* factors, Huey asserts there is little evidence in the record to reassure the court that the allegedly suggestive February 12, 2012 lineup was, nevertheless, reliable. Again, we disagree.

In its order, the trial court did not consider whether the February 12 lineup was suggestive, noting the parties did not argue it was suggestive, and instead applied the *Biggers* factors to determine whether the identification was reliable. Based on the testimony rendered during the suppression hearing, the trial court found the victim "was able to remember clearly certain details about the perpetrators in February, such as their complexions, hairstyles, whether they were clean shaven, and their clothing, because he was no longer under the stress and shock of the robbery and assault." The trial court found the victim "had ample opportunity to view both perpetrators while they held him at gunpoint," and "he reiterated at the hearing that he kept staring at the guns and the perpetrators during the robbery." When considering the lapse of time between the robbery and February 2012 identification, the trial court found the victim "was able to make a positive identification." The court then addressed Huey's argument the victim was merely picking the same photograph selected during the December 2011 lineup and found, "the images used of Huey in the two photospreads were completely different." According to the trial court, while the victim expressed hesitation when selecting Huey in the December 2011 lineup, he was able to identify him with certainty and without hesitation in February 2012 because "the shock had worn off."

The proof later presented at trial was consistent with the factual findings of the trial court made after the suppression hearing. The victim again explained that his memories of the event got better with time because he was initially in a state of shock. He offered consistent descriptions of the defendants, including Huey, at trial and identified them in the courtroom. Both the victim and Detective Frias further explained the second photograph of Huey was taken in better light and showed a clearer image of Huey's face. This evidence does not preponderate against the trial court's findings of fact at the suppression hearing, so we are bound by them.

Like the second lineup in *Dequan Hasani Bertrand*, the February 2012 lineup was not suggestive. The photographs used were different, and the victim explained he positively identified Huey in the second lineup because officers used a clearer photograph of Huey. Detective Frias explained the MPD created the second lineup after receiving additional information about the case that implicated not only Huey, but also Thirkill and Randle. Moreover, even if the February 2012 lineup was somewhat suggestive, the identification of Huey was reliable based on the totality of the circumstances. The victim had sufficient time to view Huey's face and offered a general but accurate depiction of Huey to law enforcement. Only eight days passed between the incident and the first lineup, and only sixty-five days passed between the incident and the second lineup. The

- 16 -

victim was confident of his identification of Huey the second time. Accordingly, we conclude the trial court did not err when denying Huey's request to suppress the identification of Huey made February 12, 2012. Huey is not entitled to relief on this issue.

## II.     Prior Bad Acts of Ms. Randle

In this joint appeal, Thirkill first argues the trial court erred when excluding testimony regarding prior robberies committed by Ms. Randle. The State contends the trial court properly excluded testimony regarding Ms. Randle's involvement in separate robberies because they were unfairly prejudicial. Once again, we agree with the State.

Shortly before the State called Ms. Randle as a fact witness at trial, the trial court held a hearing outside the presence of the jury to determine whether Thirkill could impeach Ms. Randle with evidence of other robberies she confessed to committing. Thirkill argued that at the time of trial, Ms. Randle had several pending robbery charges resulting from confessions made during police interviews taken as part of other investigations. In at least one of those other matters, Ms. Randle was charged with luring a man to a motel for the purpose of sexual activity and instead robbing him. Ms. Randle identified her accomplices in that matter as Huey and a man named "Cuz." Her description of Cuz matched the physical appearance of Thirkill, so pursuant to Rule 404(b) of the Tennessee Rules of Evidence, Thirkill sought to introduce the prior bad act as evidence he did not commit the crime and not as proof of conformity. Thirkill further attempted to introduce the other charges under Rule 608 of the Tennessee Rules of Evidence because the robbery charges were acts of dishonesty by Ms. Randle.

In response, the State contended Ms. Randle never expressed uncertainty regarding the involvement of Huey and Thirkill in the present matter, making her identification of Cuz as an accomplice in another matter irrelevant. Further, Ms. Randle identified Cuz via affidavit in a separate matter also involving Huey, and there was insufficient corroboration for Ms. Randle's affidavit to result in charges being brought against Cuz or Huey, so the impeachment of Ms. Randle regarding this charge would result in unfair prejudice to Huey that would not be outweighed by the probative value. Lastly, the State asserted Thirkill did not present any proof indicating which of the robberies occurred first, so they did not technically qualify as prior bad acts.

The trial court ruled that based on the arguments of counsel, Ms. Randle would be able to identify Thirkill in court and, therefore, denied the request to introduce the similar prior bad acts under Rule 404(b). The trial court further denied the impeachment request under Rule 608, concluding the probative value of the other robbery charges on credibility was outweighed by the unfair prejudicial effect on the substantive issues.

- 17 -

Finally, the trial court ruled that if Ms. Randle opened the door to the introduction of the other charges through her testimony, then it would revisit the issue. Ultimately, Ms. Randle was able to identify Thirkill at trial, and there were no further requests to impeach her with the other robbery charges.

### A. Rule 404(b)

Rule 404(b) of the Tennessee Rules of Evidence generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). Rule 404(b) allows such evidence in limited circumstances for purposes other than proving action in conformity with a character trait. *Id*. The rule sets out certain procedural requirements the trial court must follow:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The comments to Rule 404(b) provide that evidence of other crimes, wrongs, or acts should be excluded unless relevant to an issue other than the character of the defendant, such as identity, motive, intent, or absence of mistake. *Jones*, 450 S.W.3d at 891; *see also* Tenn. R. Evid. 404, Advisory Comm'n. Cmt.

Trial courts are encouraged to take a "restrictive approach [to] [Rule] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). In *Dotson*, our Supreme Court explained the policy in favor of exclusion:

> The rationale behind the general rule is that admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge . . . As this

- 18 -

Court has consistently cautioned, the jury should not "be tempted to convict based upon a defendant's propensity to commit crimes rather than . . . evidence relating to the charged offense."

*Id*. Provided the trial court substantially complied with the procedure of Rule 404(b), the trial court's decision to admit or exclude evidence will not be overturned on appeal absent an abuse of discretion. *Jones*, 450 S.W.3d at 891. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). If the trial court failed to substantially comply with the strict procedural requirements of Rule 404(b), then no deference is given to the trial court's decision to admit or exclude evidence, and this Court will determine admissibility based on the evidence presented at the jury out hearing. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

Here, the trial court held a hearing outside the presence of the jury and noted Thirkill wished to introduce at least one other robbery for the purpose of disputing his identity as one of the participants in the robbery of the victim. The trial court, however, found this evidence not to be probative because Thirkill's identity had not been disputed. The trial court further found the danger of unfair prejudice to the defendants, particularly Huey, outweighed any probative value. The trial court substantially complied with the requirements of Rule 404(b), so absent an abuse of discretion, we are bound by the decision of the trial court. Based on our review of the record, arguments of the parties, and pertinent law, the trial court did not abuse its discretion when denying Thirkill's request to impeach Ms. Randle with evidence of the other robberies she confessed to committing. Thirkill is not entitled to relief on this issue.

B.    Rule 608(b)

Rule 608(b) of the Tennessee Rules of Evidence governs the admissibility of a witness's prior conduct for impeachment and provides, in pertinent part, as follows:

> **(b) Specific Instances of Conduct.** Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . be inquired into on cross-examination examination of the witness concerning the witness's character for truthfulness or untruthfulness[.]

Tenn. R. Evid. 608(b).  Prior to allowing the cross-examination, the trial court must conduct a hearing outside the presence of the jury and find the alleged conduct has probative value and that there is a reasonable factual basis for the questioning.  Tenn. R. Evid. 608(b)(1).  The rule does not articulate whether the trial court must weigh the prejudicial effect of specific acts of conduct occurring ten years or less before the commencement of the prosecution by witnesses other than the criminally accused against their probative value, but the comments to Rule 608(b) suggest this to be a third condition to the proper use of specific instances of conduct for the purpose of impeaching a witness's character for truthfulness.  *Herbert v. Brazeale*, 902 S.W.2d 933, 939 (Tenn. Ct. App. 1995).  When doing so, the trial court must evenly balance the probative value of the act versus its prejudicial effect due to "'the high possibility that the misconduct will be given too much weight by the jury and because of the doubtful probative nature of such evidence.'"  *State v. Angela Manning*, No. 03C01-9501-CR-00012, 1998 WL 103317, at *11-12 (Tenn. Crim. App. Feb. 27, 1998) (quoting *Herbert*, 902 S.W.2d at 939).

This Court reviews a trial court's ruling under Rule 608(b) using an abuse of discretion standard.  *State v. Reid*, 91 S.W.3d 247, 303 (Tenn. 2002).  A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Lewis,* 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz,* 204 S.W.3d 772, 778 (Tenn.2006)).

In the present matter, the trial court properly held a hearing outside the presence of the jury and found Ms. Randle did confess to other robberies in statements given to police.  However, Ms. Randle also identified Huey as a participant in at least two of the other robberies, and it was possible the jury would learn of Huey's alleged involvement in these other robberies if Thirkill cross-examined Ms. Randle regarding her confessions.  For this reason, the trial court found the prejudicial effect of these specific acts outweighed its probative value as to Ms. Randle's credibility.  The trial court applied the correct legal standard when reaching this logical and reasonable conclusion.  Huey is not entitled to relief on this issue.

## III.    Sufficiency of the Evidence

Finally, Thirkill challenges the sufficiency of the evidence to sustain his aggravated robbery conviction, arguing the victim and Ms. Randle were both dishonest when testifying at trial, so there was no corroboration of evidence to implicate Thirkill in the crime.  Instead, the State, at most, merely proved Ms. Randle was in a hotel room with the victim, and the victim was robbed by two African American men. The State

disagrees and points to the adequate proof of Thirkill's guilt presented at trial. We agree with the State.

When a defendant challenges the sufficiency of the evidence on appeal, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Papas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witness face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence. *Dorantes*, 331 S.W.3d at

379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). The extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Id*. This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id*.

At trial, the State was required to prove beyond a reasonable doubt that both defendants committed aggravated robbery on December 9, 2011. Robbery, a Class C felony, "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. Robbery becomes aggravated robbery, a Class B felony, when it is "[a]ccomplished with a deadly weapon or by a display of any article used or fashioned to make a victim reasonably belief it is a deadly weapon," or "where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402.

In the present matter, only Thirkill challenges the sufficiency of the evidence to support his aggravated robbery conviction, so we will only address the proof of Thirkill's guilt. Both the victim and Ms. Randle identified Thirkill in the courtroom at trial. The victim testified that both defendants, including Thirkill, forcibly entered the motel room he rented for Ms. Randle and attacked him while holding guns. Thirkill hit him in the head with his gun. Then, while Huey held him to the floor, Thirkill removed his pants and both men kicked him repeatedly. According to the victim, Ms. Randle, Huey, and Thirkill eventually left together, taking his pants, wallet, $60, bank cards, truck, and work tools. The attack left the victim with bruises and in severe pain, but he declined subsequent medical treatment.

While Ms. Randle offered a slightly different version of events, she confirmed both Thirkill and Huey entered the motel room and attacked the victim with the intention of robbing him. She testified that only Thirkill held a gun, and he used the gun to beat the victim. After the victim fell to the ground, both defendants began kicking him. Eventually, Thirkill ran out of the room, and Ms. Randle never saw him again. Prior to leaving, Huey searched the pockets of the victim's pants. Huey and Ms. Randle left the motel room together, and when they left, the victim's truck was no longer in the parking lot of the motel.

By citing to inconsistencies in their testimony, Thirkill essentially challenges the credibility of the victim and Ms. Randle. The trier of fact is in a better position than this Court to assess the credibility of witnesses, determine the weight of the evidence and the value afforded it, and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Through its finding of guilt, the jury accredited their testimony regarding Thirkill's involvement in the aggravated robbery, and we will not disturb this

credibility finding on appeal. The proof was more than sufficient to support Thirkill's conviction for aggravated robbery, so Thirkill is not entitled to relief on this issue.

### *Conclusion*

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE